In re WILLIE RELIFORD.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. WILLIE RELIFORD, Respondent-Appellant.)

First District (3rd Division)   No. 77-691

Opinion filed September 20, 1978.

Ralph Ruebner, of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Assistant State's Attorney, of counsel), for the People.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The circuit court of Cook County found 17-year-old Willie Reliford mentally retarded and in need of hospitalization. He was committed to the facility recommended "as appropriate to his needs" by the Department of Mental Health and Developmental Disabilities. In this appeal Reliford argues that his institutionalization, pursuant to portions of the Mental Health Code of 1967 (Ill. Rev. Stat. 1975, ch. 91½, pars. 1—1 *et seq.*) contravenes several provisions of both the United States and the Illinois constitutions. We find that, as applied to Reliford, the Mental

Health Code violates the due process clauses of both constitutions. Because this finding is dispositive of the case we need not reach Reliford's other arguments.

Reliford was indicted for theft, but found not fit to stand trial; his custody was transferred to the Department of Mental Health. A petition, filed in the circuit court, asserted that he was mentally retarded and in need of mental treatment as defined by the Mental Health Code. (Ill. Rev. Stat. 1975, ch. 91½, pars. 1—12 and 1—11.) It stated that Reliford required admission to a mental hospital and requested that the court conduct a hearing to determine whether Reliford needed mental treatment. As required by the statute, two doctors filed certificates in support of the petition. (Ill. Rev. Stat. 1975, ch. 91½, par. 8—3.) One said Reliford required hospitalization because of his "questionable ability to care for [him]self." The other suggested that he was psychotic. Both certificates characterized Reliford as mentally retarded.

At a hearing on the petition, Reliford was represented by an assistant public defender. Sister Meckley, a social worker, testified that Reliford's legal guardian, his aunt, was unable to attend the proceeding. The trial judge telephoned the aunt and obtained permission to proceed in her absence. The phone conversation was not made part of the record.

Three doctors, all of whom had examined Reliford, testified for the State. They all found him to be moderately mentally retarded and recommended his hospitalization. All agreed that Reliford suffered from some sort of personality disorder, manifested by his frequent thefts, but that the disorder was not related to his mental retardation. Except for this testimony of the doctors, no other information about Reliford was introduced into the record.

Doctor Gerald Wellens, a registered psychologist, investigated Reliford's mental abilities through a variety of tests. He reported that results of those tests showed that Reliford was in a mildly "educable range" of mental retardation with a mental age near 9 years old, and an I.Q. of 54. Wellens testified that he read Reliford's "record" which showed an 8-year history of stealing. According to Wellens, this indicated an antisocial personality disorder. He called Reliford "compulsive" and a "thief" but said that the behavior was unrelated to the mental retardation. While the stealing did not mean that Reliford was "of danger" to the community, Wellens believed that Reliford needed some treatment. He did not know what kind of therapy would solve the problem. Without the antisocial personality disorder, Reliford's mental retardation, Wellens said, would not itself cause him to recommend institutionalization but rather he would suggest community treatment. However, Wellens thought that Reliford should be removed from his home environment because he needed treatment for this personality disorder. He explained

that he understood that community treatment had been "unsuccessfully attempted" with Reliford already.

Doctor Edward Page-El, M.D., also evaluated Reliford's mental status and diagnosed him as mildly mentally retarded. Page-El characterized Reliford as oriented in time and place but having little insight into the solution to problems. Reliford's affect, said Page-El, was "somewhat flat." In addition to the retardation, Page-El found that Reliford had epilepsy and an unspecified personality disorder. Page-El said that Reliford was not psychotic. The doctor associated the personality disorder with the disruption of Reliford's relationship with his aunt which occurred when Reliford's sisters began living with him and his aunt. Page-El said community placement would have been appropriate except for Reliford's "chronic history of stealing and numerous arrests." Removing Reliford from his home environment, according to Page-El, would cause a decline in this stealing. Page-El cautioned, however, that any positive attempt at treatment might reinforce the behavior as a means of getting attention. Page-El recommended institutionalization.

Doctor Basil Siomopoulous, M.D., said he, too, conducted a psychiatric interview with Reliford and he agreed with the diagnosis that Reliford suffered from mild retardation. He found that although coherent and oriented, Reliford's vocabulary and general fund of information was limited, and that he had a speech defect which made communication difficult. Siomopoulous said that Reliford also had a seizure disorder which was being successfully treated with medication.

It was Siomopoulous' opinion that Reliford would not be able to provide for his own needs if he were not hospitalized. According to Siomopoulous, Reliford's stealing habits are related to a "social-cultural factor." He hypothesized that the stealing was a means by which Reliford gained esteem among his peers. Siomopoulous said that he had no information about Reliford's "family constellation" and that he disagreed with the other two doctors, saying that even in the absence of the thievery, he would recommend institutionalization. Siomopoulous specifically named the Kankakee State Hospital, a developmental disability facility, as the place in which to situate Reliford. However, Siomopoulous had no specific contact with that hospital and was recommending it only because he believed they treated mentally retarded patients.

The State presented no other evidence. Reliford's motion to dismiss the petition was denied. Reliford presented no evidence. The hearing was continued on the court's motion for further evaluation of the appropriate facility for Reliford.

The second hearing, held two weeks later, was presided over by a different judge. The State informed the court that Reliford's attorney was

not present due to illness but that she was in accord with the suggestion that Reliford be placed in the Kankakee Development Center if he were to be institutionalized. Doctors Wellens and Siomopoulous both testified, repeated their diagnosis of mental retardation and the antisocial personality disorder, and both suggested institutionalization at Kankakee. A recommendation by Doctors Wellens and Cafill from the Illinois Institute for Developmental Disabilities was read into the record by the State's Attorney. It said that Reliford would benefit from placement in the Kankakee Development Center because it had a program for higher functioning "DD" (developmentally disabled) patients with a "work-shop." It also would be most able to program for Reliford's secondary diagnosis of antisocial personality disorder. In reply to the court's inquiry, Reliford said that he was aware of the nature of the proceedings. The court entered an order stating that Willie Reliford was mentally retarded, in need of hospitalization, and should be placed in the behavioral control unit at the Kankakee Development Center.

Several cases have considered the constitutionality of the Mental Health Code as it relates to those with mental disorders. (See, *e.g., People v. Sansone* (1974), 18 Ill. App. 3d 315, 309 N.E.2d 733; *In re Stephenson* (1977), 67 Ill. 2d 544, 367 N.E.2d 1273.) We have found no case, however, which examined it in relation to those who are mentally retarded. This case, then, presents the question: When is it constitutionally permissible for a State to involuntarily institutionalize a person as mentally retarded.

■■ A finding of mental retardation does not necessarily mean that a person loses his rights and responsibilities under the law. (*Peach v. Peach* (1966), 73 Ill. App. 2d 72, 218 N.E.2d 504.) To the fullest extent possible, mentally retarded individuals possess the same rights as other individuals. (See *Boyd v. Board of Registrars* (1975), 368 Mass. 631, 334 N.E.2d 629.) People diagnosed as mentally retarded are a heterogeneous group, ranging in abilities from those who are "trainable," living relatively normal lives, to those who are profoundly retarded, unable to communicate or care for themselves. (See C. Murdock, *Civil Rights of the Mentally Retarded*, 48 Notre Dame Law. 133 (1972).) These differences among the mentally retarded may necessitate a variety of procedures for dealing with their problems and a flexible concept of what is their "best interest." The role of a guardian in seeing to their welfare may require several approaches to analyzing their rights. (See, *e.g., In re Roger S.* (1977), 19 Cal. 3d 921, 569 P.2d 1286, 141 Cal. Rptr. 298, which deals with the rights of a guardian to hospitalize a minor or incompetent.) However, "the principles of equality and respect for all individuals" require the recognition of certain constitutional and personal rights in those that are mentally retarded, and the application of due process safeguards to

protect those rights. *Superintendent of Belchertown State School v. Saikewicz* (1977), ___ Mass. ___, ___, 370 N.E.2d 417, 427.

Preeminent among these rights is personal liberty, the right to live in freedom from unwarranted interference by the State. Involuntary commitment of any person disrupts this freedom, entailing a "massive curtailment of liberty." (*Humphrey v. Cady* (1972), 405 U.S. 504, 509, 31 L. Ed. 2d 394, 402, 92 S. Ct. 1048.) Forced institutionalization can only be justified by a recognized and substantial government interest. *O'Connor v. Donaldson* (1975), 422 U.S. 563, 575, 45 L. Ed. 2d 396, 405, 95 S. Ct. 2486, 2493; *In re Stephenson* (1977), 67 Ill. 2d 544, 554, 367 N.E.2d 1273, 1276.

■■■ Similarly, the law recognizes an individual's interest in preserving the "inviolability of his person," from unendorsed intrusion through unconsented to treatment. (*Pratt v. Davis* (1905), 118 Ill. App. 161, 166, *aff'd* (1906), 224 Ill. 300, 79 N.E. 562.) Again, the State's infringement of privacy is tolerated only when the State's interest meets an acceptable and narrow governmental purpose. *Roe v. Wade* (1973), 410 U.S. 113, 153, 35 L. Ed. 2d 147, 177, 93 S. Ct. 705; *Saikewicz* (1977), ___ Mass. ___, ___, 370 N.E.2d 417, 424.

■■■ At the very minimum, in order to meet due process standards, the statute permitting a State to involuntarily hospitalize an individual must articulate the State's purpose for the institutionalization. The mere status of mental illness or mental retardation of a person without further inquiry or rationale, is an insufficient justification for involuntary institutionalization. (*O'Connor v. Donaldson* (1975), 422 U.S. 563, 575, 45 L. Ed. 2d 396, 405, 95 S. Ct. 2486, 2493; *People v. Sansone* (1974), 18 Ill. App. 3d 315, 323, 309 N.E.2d 733, 739.) Section 1—11 of the Mental Health Code, used to institutionalize those with mental disorders, requires a showing that a person has a mental disorder and because of that disorder he may harm himself or others. In contrast, section 1—12, defining mental retardation, does not articulate any reason besides mental retardation for the necessity of commitment. Several of the sections in the Mental Health Code dealing with commitment procedures maintain this limited approach, only calling for the assertion of mental retardation for their application. (See, *e.g.*, Ill. Rev. Stat. 1975, ch. 91½, par. 9—6.) Therefore, to the extent that these provisions in the Illinois Mental Health Code can be interpreted to authorize unconsented-to institutionalization and treatment merely on a finding of mental retardation they are of questionable constitutionality.

The State, however, contends that the Mental Health Code does not base involuntary commitment of a person who is mentally retarded on the finding of mental retardation alone. Under the State's reading of the Mental Health Code, unconsented to hospitalization of a person who is

mentally retarded is proper only when there is evidence that the person is (1) mentally retarded; and (2) in need of treatment. (See Ill. Rev. Stat. 1975, ch. 91½, pars. 8—1 and 9—5, which apply to persons "in need of treatment as mentally retarded.") Its interest in treatment is justified, the State argues, under its *parens patriae* power which authorizes it to act in a person's best interest to cure or alleviate illness. (See *O'Connor*; *Jackson v. Indiana* (1972), 406 U.S. 715, 32 L. Ed. 2d 435, 92 S. Ct. 1845.) The State identifies due process safeguards in section 9—6, which limits a court's choice of disposition of a case after a finding of mental retardation to the least restrictive method of treatment. Ill. Rev. Stat. 1975, ch. 91½, par. 9—6.

Neither the United States Supreme Court nor the Illinois Supreme Court has considered whether a State's interest in providing treatment is a sufficient enough reason under the constitution to abrogate personal privacy and freedom. (See *O'Connor v. Donaldson* (1975), 422 U.S. 563, 574 n.10, 45 L. Ed. 2d 396, 406 n.10, 95 S. Ct. 2486, 2493 n.10.) The one court that considered a standard somewhat similar to the "need for treatment" purpose put forth to justify Reliford's commitment, rejected it as impermissively vague. In *Commonwealth ex rel. Finken v. Roop* (1975), 234 Pa. Super. 155, 339 A.2d 764, 778, it was held that "in need of care" was inadequate because once an individual is found to have a mental disorder or to be mentally retarded "it would be impossible not to find that the individual is in need of care." However, we need not reach the question of whether a showing of "need of treatment" alone is a constitutionally adequate standard for a State's involuntary hospitalization of a person who is mentally retarded, since in this case the State failed to prove that Reliford needs any "treatment" at all.

Even if we were to accept the State's argument that a "need of treatment" standard is acceptable, a review of the record discloses that it has been improperly applied to Reliford, violating his due process rights. First, the nature of Reliford's asserted mental affliction, mental retardation, has nothing to do with the necessity for his treatment, which is the reason the State asserts for his institutionalization. Second, the evidence the State presented is insufficient to prove the necessity of Reliford's involuntary treatment.

■■ Due process requires that there be a reasonable relationship between the State's purported interest in institutionalizing a person and the reasons for which the individual is ultimately committed. (See *Jackson v. Indiana* (1972), 406 U.S. 715, 738, 32 L. Ed. 2d 435, 451, 92 S. Ct. 1845.) Further, the language of the Illinois Mental Health Code necessitates this, with wording that makes institutionalization proper only when a person is "in need of treatment as *mentally retarded*." (Emphasis added.) (Ill. Rev. Stat. 1975, ch. 91½, pars. 8—1, 8—3 and 8—4.) In this case, the State has

failed to show the causal link between the retardation and the treatment. All the evidence connected with the necessity for treatment of Reliford is directed at his unidentified "social disorder"; his alleged thievery. All three doctors said that this disorder is unrelated to his mental retardation. Two of the doctors said that without the disorder they would not recommend institutionalization. In order to institutionalize Reliford for his disorder, proof satisfying the criteria of section 1—11 is necessary, showing that Reliford is either a danger to himself or to others because of the disorder. (*In re Sciara* (1974), 21 Ill. App. 3d 889, 896, 316 N.E.2d 153, 158.) The record does not sustain either proof and institutionalization of Reliford therefore, violates his due process.

Finally, if "treatment" is an acceptable standard for commitment the information contained in this record pertaining to the type of treatment Reliford would be subjected to is insufficient to prove its necessity. It does not in the least meet the "clear and convincing" standard which must be established before a State can civilly commit an individual. (*Sansone; In re Stephenson.*) The only type of treatment suggested by the testimony of the doctors is the removal of Reliford from his home environment. The facility Reliford is placed in is recommended because it is able to "program for" Reliford's disorder, according to the Illinois Institute for Developmental Disabilities. Dr. Page-El, in fact, warned of problems if any affirmative treatment is attempted. No description of the type of treatment Reliford would experience is presented by the evidence; no discussion is available of the likelihood of Reliford's improvement from such treatment; whether there are any dangers involved and how much these weigh against the possibility of success of the treatment, or what consequences would occur if there were no treatment at all are factors largely missing from the evidence.

■■ While a court proceeding may not be the most perfect vehicle to determine medical matters, as noted in *O'Connor*:

> "Where 'treatment' is the sole asserted ground for depriving a person of liberty, it is plainly unacceptable to suggest that the courts are powerless to determine whether the asserted ground is present. See *Jackson v. Indiana*, 406 U.S. 715, 92 S. Ct. 1845, 32 L. Ed. 2d 435." (422 U.S. 563, 574 n.10, 45 L. Ed. 2d 396, 406 n.10, 95 S. Ct. 2486, 2493 n.10.)

In order for a court to decide to institutionalize a person as mentally retarded much more than the bare assertion from a medical expert that it is his opinion that treatment is necessary and beneficial is required. The weight of an expert's opinion is measured by the reason given for it and the factual details marshalled in support of it. (*People v. Brown* (1978), 57 Ill. App. 3d 528, 532, 373 N.E.2d 459, 462; *Cannell v. State Farm Fire & Casualty Co.* (1975), 25 Ill. App. 3d 907, 323 N.E.2d 418.) A court

must be able to evaluate the opinion and make a decision whether treatment is in the person's best interest based on all relevant factors. (See *Saikewicz*.) The paucity of such explanation and facts in this case forces us to find that the evidence does not establish clearly and convincingly that Reliford needs any treatment.

The due process clauses of both State and Federal constitutions prevent the involuntary institutionalization of a person by the State solely because he is mentally retarded. Involuntary commitment can only be justified by a State purpose related to the person's mental affliction and established by clear and convincing evidence. This was not done in the case of Willie Reliford and therefore, we reverse the order of the circuit court of Cook County which found him mentally retarded and ordered his hospitalization.

Reversed.

McNAMARA and SIMON, JJ., concur.