*In re* JEFFERY W. ORR, Asserted to be a Person Subject to Involuntary Admission (The People of the State of Illinois, Petitioner-Appellee, v. Jeffery W. Orr, Respondent-Appellant).

Fourth District   No. 4—87—0815

Opinion filed November 10, 1988.

500

Jeff M. Plesko, of Guardianship & Advocacy Commission, of Carbondale, for appellant.

Jeffrey K. Davison, State's Attorney, of Decatur (Kenneth R. Boyle, Robert J. Biderman, and Gwendolyn W. Klingler, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

Following a hearing, the circuit court of Macon County found respondent was a person subject to involuntary admission because of his mental illness, and the reasonable expectation his illness would cause him to seriously harm himself or another in the near future. (Ill. Rev. Stat. 1985, ch. 91½, par. 1—119(1).) The court ordered respondent be involuntarily admitted to a mental health facility pursuant to the Men-

tal Health and Developmental Disabilities Code (Mental Health Code) (Ill. Rev. Stat. 1985, ch. 91½, pars. 3—700 through 3—819) and authorized the State to administer medication. Respondent appeals the order to involuntarily admit and medicate him.

On October 20, 1987, two Champaign police officers filed petitions alleging the respondent Jeffery W. Orr (Jeff) was a person subject to involuntary admission. (Ill. Rev. Stat. 1985, ch. 91½, pars. 3—601, 3—606.) The petition was accompanied by the necessary physicians' certificates affirming the fact Jeff was mentally ill and because of his illness was reasonably expected to inflict serious physical harm upon himself or another in the near future. Ill. Rev. Stat. 1985, ch. 91½, pars. 3—602, 3—702.

A hearing on the petition was held on October 27, 1988. One of the petitioning officers testified as follows. On October 18, 1987, Officers Wagner and Stevens were dispatched to Bradley's, a Champaign night spot, to investigate the second half of a disturbance complaint. Jeff had earlier complained to another officer that his car was damaged during an altercation in the Bradley's parking lot. Officer Wagner was allowed to testify as to what the Bradley's employees who witnessed the incident told him had transpired that evening. Defense counsel made a continuing hearsay objection.

According to the witnesses, Jeff parked his vehicle in an employee parking area in the Bradley's lot. When a Bradley's security person asked Jeff to move the vehicle, Jeff became belligerent and refused. The security officers explained it was "teen night" at Bradley's and as a result only teenagers were allowed into the establishment. Jeff, who was 33 years old at the time, was told he would not be admitted and was asked to leave. Jeff entered the building and asked to speak with the manager. After the manager talked to Jeff, the latter said he would leave the area voluntarily.

The employees acting as security guards in the lot told the officers they had to jump out of the way of Jeff's automobile as he proceeded to recklessly maneuver it out of the lot at a high rate of speed. One employee was almost struck while another kicked out the rear passenger window in an attempt to get out of Jeff's way. Jeff then flagged down an officer and reported the damage to his car.

The officers interviewed Jeff when he returned to the scene at Bradley's. Jeff said the employees were ganging up on him and he was not being treated fairly. The officer perceived Jeff as very argumentative and belligerent. His story did not jibe with those told by the other witnesses at the scene. Officer Wagner said: "Jeff's demeanor was cooperative at first and then *** he became more and

more agitated. He got very verbal, very vocal, very argumentative and at that point, we decided to take him into custody, based upon the witness's [*sic*] accounts." Jeff did not threaten anyone while in the officer's presence.

Over defense counsel's objection, Wagner was asked to give his opinion if Jeff was mentally ill, posed a physical threat to himself and others and was in need of immediate admission to prevent such harm. Wagner's response was affirmative. When asked what made Jeff's conduct different from any other disorderly conduct, Wagner told the court it was Jeff's argumentative nature, incoherent thought pattern, and the manner in which he drove the vehicle at the two employees. The court asked: "Did you observe any of his driving or is all your testimony based on what someone told you?" Wilson replied: "All of my testimony is based on other witnesses."

Dr. Morton Tabin, a psychiatrist at Adolf Meyer Mental Health and Development Center (Meyer), testified Jeff had been a patient at Meyer for about one week. The doctor diagnosed Jeff as suffering from mental illness with a schizoaffective disorder and a problem with impulse control. Jeff had refused to take medications. The doctor indicated Jeff had been hospitalized multiple times for bizarre or aggressive behavior. In Tabin's opinion, Jeff's prognosis depended on his cooperation with counseling and his acceptance of medication.

From the records and communications with staff, the doctor testified he was aware Jeff had to be restrained on one occasion when he was first admitted to Meyer. It was recorded that Jeff had injured staff members during that altercation. Dr. Tabin has not seen any violent physical activity from Jeff since he was moved to Dr. Tabin's unit. Dr. Tabin said: "We have seen a lot of pestiness and unable [*sic*] to control temper in the sence [*sic*] of asking the same things over and over again *** but I haven't seen any physical acting out since he came in."

Dr. Tabin opined Jeff was mentally ill and was capable of harming himself or someone else in the near future. Tabin said: "My conclusion of him harming someone would be gleemed [*sic*] from my perusal of the petition." The doctor recommended Jeff be committed to Meyer and asked the court for authority to force medicines on him. On cross-examination, Tabin said his opinion was based on Jeff's activity both while at Meyer and in the Bradley's parking lot.

Jeff testified on his own behalf as to the incident at Bradley's. Jeff said three males sitting on a pickup truck told him he was improperly parked in an employee space. The space was not marked and the trio did not identify themselves. The three followed Jeff inside the

building and, after he was told to leave, they escorted him to his car. Jeff said he had to back out carefully to avoid hitting a nearby parked car. Jeff felt he was being pursued, so he drove forward quickly. One of the men got out of the way and stood next to the nearby vehicle, leaving Jeff just enough room to get by. At that point, one of the men kicked out one of Jeff's car windows. Jeff said he had no intention of harming or threatening anyone in the lot with his vehicle, but was merely trying to leave the scene. He made no oral threats to anyone. Jeff denied being mentally ill or dangerous and said: "I hope I am not abrasive to anyone to cause any conflicts here or anywhere else."

At a later hearing the same day, the court and counsel discussed the implications of the alleged hearsay testimony of Officer Wagner. The State conceded the testimony was hearsay, but argued nonetheless the testimony of Dr. Tabin about Jeff's unruly behavior while at Meyer was sufficient evidence to meet the clear and convincing standard to commit him. The State found the officer's direct observation of Jeff after the Bradley's incident and at the hospital was also significant. The public defender argued Jeff would not have been committed but for the improperly admitted hearsay testimony of Officer Wagner.

The court also discussed Dr. Tabin's request that he be given authority to forcibly medicate Jeff and Jeff's right to refuse medications under section 2—107 of the Mental Health Code. (Ill. Rev. Stat. 1985, ch. 91½, par. 2—107.) The court found the statute confusing, but interpreted it to grant the court the authority to order that medication be forcibly administered to involuntary patients. The court then said: "[E]ven if I authorize [medication] and he refuses to take it as the doctor indicated he would, he cannot be forced to do it." The public defender objected to the court's order on his client's behalf.

The court found Jeff to be a person subject to involuntary admission and ordered him hospitalized in the Department of Mental Health and Developmental Disabilities, adding, "State authorities are given the authority to administer medication; however, pursuant to statute they may be refused and shall not then be given." The latter part of the sentence following the semicolon and allowing refusal was later stricken from the order.

Notice of appeal was filed on November 9, 1987, and the Guardianship and Advocacy Commission was appointed to represent Jeff.

■ Section 1—119(1) of the Mental Health Code (Ill. Rev. Stat. 1985, ch. 91½, par. 1—119(1)) provides that a person is subject to involuntary admission if he is mentally ill and, because of his mental illness, is reasonably expected to inflict serious physical harm upon himself or another in the near future. In a proceeding on a petition for

involuntary admission, the State is required to prove the necessary allegations of the petition by clear and convincing evidence. (*In re Stephenson* (1977), 67 Ill. 2d 544, 367 N.E.2d 1273.) A factual basis for the medical opinion upon which the decision to commit is based must be judged by a similar standard. (*People v. Sansone* (1974), 18 Ill. App. 3d 315, 309 N.E.2d 733.) To meet its burden of proof the State must submit "explicit medical testimony" that the respondent can be expected to be a serious danger to himself or someone else because of his mental illness. (*In re Cochran* (1985), 139 Ill. App. 3d 198, 200, 487 N.E.2d 389, 391.) Mental illness alone will not justify commitment. *People v. Lang* (1986), 113 Ill. 2d 407, 498 N.E.2d 1105.

■ The trial court's decision following an involuntary admission hearing is given great deference and will not be set aside at the appellate level, even if the reviewing court, after applying the clear and convincing standard, would have ruled differently. (*In re Mazzara* (1985), 133 Ill. App. 3d 146, 478 N.E.2d 567.) The trial court is in the best position to determine the credibility of the testifying witnesses and weigh the evidence. Its determination should not be reversed unless it is manifestly erroneous. *People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6.

■ Here, the trial court heard a variety of testimony at the hearing and had before it the petition for involuntary admission, the doctors' certificates supporting the petition, and the comprehensive examination and social investigation. It has been recognized the medical science of predicting future dangerousness is inexact in civil commitment cases so that a commitment order will normally be upheld by a reviewing court if there is a reasonable expectation the respondent might engage in dangerous conduct. (*In re Johnston* (1983), 118 Ill. App. 3d 214, 454 N.E.2d 840.) Moreover, where "there exists evidence of prior dangerous conduct, together with evidence that the respondent remains in need of mental treatment, the commitment order should be affirmed." *In re Williams* (1987), 151 Ill. App. 3d 911, 921, 503 N.E.2d 816, 822-23.

Jeff argues a factual basis for his involuntary admission and an explicit medical opinion supporting the decision are lacking in this case. Jeff requests the commitment order be vacated because Dr. Tabin's diagnosis of medical illness and the conclusion Jeff was a physical threat to himself and others were improperly based on noncurrent behavior and the reports of others, rather than on acts personally observed by the doctor. We disagree.

■ A recommendation of involuntary hospitalization requires a current condition of mental illness and future likelihood of harm, not

mere reliance on historical facts. (*In re Love* (1977), 48 Ill. App. 3d 517, 363 N.E.2d 21.) In *People v. Lang* (1986), 113 Ill. 2d 407, 498 N.E. 2d 1105, the respondent objected to the reliance on prior psychological evaluations, staff reports and other medical records by the testifying physicians at a hearing to determine if respondent was a person subject to involuntary commitment under section 1—119 of the Code. Relying on *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140, and Rule 703 of the Federal Rules of Evidence (Fed. R. Evid. 703), the court held an expert may utilize otherwise inadmissible reports prepared by others in forming his opinion if the facts or data are of a type reasonably relied upon by experts in the particular field. The *Lang* court agreed with the holding of the Seventh Circuit in *United States v. Lawson* (7th Cir. 1981), 653 F.2d 299, that evaluations prepared by other psychiatrists, reports of observations by staff at a Federal hospital, the defendant's service records and FBI reports were of the type that psychiatrists would rely upon in making a professional judgment. *Lang* also cited the holding in *People v. Anderson* (1986), 113 Ill. 2d 1, 8, 495 N.E. 2d 485, 487, *cert. denied* (1986), 479 U.S. 1012, 93 L. Ed. 2d 713, 107 S. Ct. 658, that "a patient's psychiatric history is one of the most important criteria in making a diagnosis."

■ From Dr. Tabin's testimony, we conclude it is clear in this case the trial court did not abuse its discretion in determining Jeff was subject to involuntary admission. Dr. Tabin's conclusion that Jeff's mental illness made him a threat to himself and society was based on (1) Jeff's behavior while hospitalized at Meyer and (2) the doctor's reading of the petition for involuntary admission which described Jeff's behavior while at Bradley's.

As to the first factor, Jeff complains the doctor's evaluation was not supported by scientific observations such as hallucinations, delusions, catatonic behavior, or other characteristics associated with debilitating mental illness of a psychotic nature. We find it more significant the record shows the doctor relied on his own personal observations of Jeff while hospitalized, in addition to Jeff's history of hospitalization, including one report of violence. On the authority of *Wilson* and *Lang*, we hold it was proper for Dr. Tabin to examine Jeff's *complete* psychiatric history to form an opinion as to his then current and future dangerousness. Certainly the second factor, the petition for involuntary admission, was part of that history and was thus relevant to the doctor's medical opinion. Jeff's failure to object at trial to the bases for Dr. Tabin's opinion further supports our con-

clusion the trial court's finding was not in error. Our disposal of this issue on the merits removes the need to address the waiver principle.

We further reject Jeff's argument the entire proceeding below was contaminated by what the trial court labeled as Officer Wagner's hearsay testimony. The officer's account of the incident on October 18, 1987, was nothing more than a recitation of the grounds for the petition to involuntarily admit Jeff. Clearly, Wagner's personal observations of Jeff after the incident did not constitute hearsay.

■ Section 3—606 of the Mental Health Code provides as follows:

"A peace officer may take a person into custody and transport him to a mental health facility when, as a result of his *personal observation*, the peace officer has reasonable grounds to believe that the person is subject to involuntary admission and in need of immediate hospitalization to protect such person or others from physical harm. Upon arrival at the facility, the peace officer shall complete the petition under Section 3—601." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 91½, par. 3—606.)

This statute has been interpreted to allow the police to execute the above procedure, even absent personal observation of erratic behavior, as long as probable cause exists to believe the individual is in need of hospitalization. *McKinney v. George* (N.D. Ill. 1983), 556 F. Supp. 645, 650 n.12, *aff'd* (7th Cir. 1984), 726 F.2d 1183.

■ The decision to transport Jeff to a mental health facility was made by police officers who were informed by citizens of Jeff's bizarre and violent behavior at Bradley's. The officers were obligated by statute to fill out a petition upon arrival with Jeff at the facility. The trial court clearly understood some of Officer Wagner's testimony was hearsay and did not rely on the hearsay testimony in concluding respondent was subject to involuntary admission. There is nothing in the record which indicates Officer Wagner's testimony, which elaborated on the petition and conveyed his personal observations of Jeff, in any way tainted the proceeding or Dr. Tabin's opinion.

Next, Jeff maintains the trial court's order authorizing the State to administer medication to Jeff as part of his involuntary admission was void for want of statutory authority. We agree.

■ Section 2—101 of the Mental Health Code (Ill. Rev. Stat. 1985, ch. 91½, par. 2—101) provides that a person receiving treatment or habilitation under the Mental Health Code is not presumed incompetent. That determination must be made at a separate proceeding under the "disabled adult" provisions of the Probate Act of 1975 (Ill. Rev. Stat. 1985, ch. 110½, par. 11a—3). Section 3—811 of the Mental Health Code instructs the courts to order the least restrictive

alternative available for appropriate treatment of involuntary mental patients and provides the following treatment options: department hospitalization, alternative treatment in a mental health facility, private hospital or VA hospital, or placement with an individual who will provide care and custody. (Ill. Rev. Stat. 1985, ch. 91½, par. 3—811.) The courts are not authorized to make discrete treatment milieu decisions such as designating a specific facility to treat the patient. *In re Langdon* (1977), 53 Ill. App. 3d 768, 368 N.E.2d 1143.

At the hearing on the petition for involuntary admission, Dr. Tabin testified as to his opinion Jeff was mentally ill and capable of harming someone. When asked what he recommended the court to do, Dr. Tabin replied:

> "I would recommend he be committed at Meyer since I get the feeling that his anti-social types of outbursts in the community are taken with a cavalier attitude and nothing every [sic] much happens to him in the community. I would be afraid he would eventually harm someone because the police don't ever press charges, so in that sense it is best for him and society he be put somewhere so, yes, I think he should be committed here."

When asked whether that was the least restrictive placement he could recommend, Dr. Tabin said: "I think so. I would want to add that if he is sent here, though, that it would be to no avail unless the judge authorized us to force medicines on him. Sixty days without accepting meds, I think, is useless."

The trial court found Jeff subject to involuntary admission, ordered that he be hospitalized in the Department of Mental Health, and further authorized the State to administer medication. The record reflects the trial court was confused by section 2—107 of the Mental Health Code, which provides:

> "An adult recipient of services, or, if the recipient is under guardianship, the recipient's guardian, shall be given the opportunity to refuse generally accepted mental health or developmental disability services, including but not limited to medication, unless such services are necessary to prevent the recipient from causing serious harm to himself or others. If such services are refused, they shall not be given." (Ill. Rev. Stat. 1985, ch. 91½, par. 2—107.)

The court interpreted that section 2—107 allows a recipient of services to refuse medication even in an emergency situation. The original order entered authorized State administration of medication to Jeff, subject to his refusal. The portion of the order providing for re-

fusal was later lined out. Jeff argues the order effectively gave the State authorities the right to forcibly medicate him for 60 days as Dr. Tabin requested. See Ill. Rev. Stat. 1985, ch. 91½, par. 3—813.

The State argues the most logical interpretation of section 2—107 is one which would honor the patient's right to refuse medication, unless it is necessary to prevent harm to the patient or others. Jeff does not submit a conflicting interpretation of the statute, but argues the trial court had limited authority to find him subject to involuntary commitment and lacked the statutory power to authorize medication.

■ The Mental Health Code provides for an individualized medical treatment plan that is designed solely by the recipient, his relatives, and his physician. (Ill. Rev. Stat. 1985, ch. 91½, pars. 2—102(a), 2—107.) The statute does not give the court a place in the treatment process except to review the plan periodically and to monitor the recipient's progress. (Ill. Rev. Stat. 1985, ch. 91½, par. 3—814.) Having made the decision to hospitalize Jeff, we find the trial court was authorized to do no more, despite Dr. Tabin's request for forced medications.

■ The parties agree the medications at issue in this appeal are major tranquilizers known as "psychotropic" or "anti-psychotic drugs." The Illinois Administrative Code contains regulations promulgated by the Department of Mental Health to regulate the administration of psychotropic drugs. These regulations provide such drugs may not be prescribed for more than 30 days. (59 Ill. Adm. Code 112.90(a)(5) (Supp. 1986).) The order entered on October 27, 1987, was, in effect, a blanket authorization of forced medication for 60 days. Not only was the order outside the statutory authority of the Mental Health Code, we find it also exceeded the statutory maximum period under the Administrative Code for psychotropic medications.

■ For purposes of clarification, it is necessary to discuss the extent to which a person involuntarily committed to a mental health facility can refuse medicinal care under section 2—107. It is proper for a reviewing court to consider a subsequent amendment as a legislative interpretation of the original statute. (*People v. Williams* (1986), 142 Ill. App. 3d 266, 491 N.E.2d 941.) When a statute is ambiguous, as here, a later amendment may be deemed to express the original legislative intent. (*O'Connor v. A & P Enterprises* (1980), 81 Ill. 2d 260, 408 N.E.2d 204.) Effective July 1, 1988, amended section 2—107 will more clearly provide that if a recipient refuses services, including but not limited to medication, "they shall not be given unless such services are necessary to prevent the recipient from causing serious harm to himself or others." Though the wording of section 2—

107 as it was originally interpreted by the trial court is rather awkward, in light of its amendment, we find it clear the provision gives recipients the right to refuse medication, absent an emergency situation where the recipient or others are endangered. To construe the statute so that it gives the State unlimited authority to medicate involuntarily admitted patients would erroneously render a portion of the language superfluous. See *People v. Singleton* (1984), 103 Ill. 2d 339, 345, 469 N.E.2d 200, 203.

On the basis of the constitutional right to privacy, the Oklahoma Supreme Court held that involuntary mental patients have a right to refuse medication. This right may be qualified by only two countervailing State interests: (1) protection of the patient or society under the police power or (2) care of a patient declared legally incompetent under the doctrine of *parens patriae*. The latter relationship between the State and the patient does not arise until the adult patient has been judicially determined incompetent. *In re Mental Health of K.K.B.* (Okla. 1980), 609 P.2d 747.

In *United States v. Charters* (4th Cir. 1987), 829 F.2d 479, the court held the government cannot force medications on an involuntary patient until the threat to the government's interest in safety and security is manifest. The Fourth Circuit found the respondent's potential for violence, if undetained, did not justify his forcible medication. *Charters* held: "The government may not force an unconsenting individual to hazard the present danger of antipsychotic medication upon a mere supposition that at some future time the individual may become dangerous." *Charters*, 829 F.2d at 493.

*Charters* also recognized the opinion of the Tenth Circuit in *Bee v. Greaves* (10th Cir. 1984), 744 F.2d 1387, that forcible medication is not a reasonable response to safety or security if there are less drastic means to achieve the same purpose. *Bee* suggested that "less restrictive alternatives, such as segregation or the use of less controversial drugs like tranquilizers or sedatives, should be ruled out before resorting to antipsychotic drugs." *Bee*, 744 F.2d at 1396.

The Indiana Supreme Court in *In re Mental Commitment of M.P.* (Ind. 1987), 510 N.E.2d 645, held that a patient's statutory right to refuse treatment cannot be set aside unless the State demonstrates by clear and convincing evidence that the medications are necessary to treat the condition and not just to control behavior, and that the benefits of the treatment outweigh the risks of harm. Other treatment alternatives must be considered.

■■■ The State asserts the trial court's order authorizing medication was justified because the evidence produced at trial indicated Jeff

was a person who posed an immediate threat of harm. The State notes Jeff has been hospitalized over 35 times in the past for mental illness and argues that if the court did not grant Dr. Tabin's request to force medications, Jeff's illness would have gone untreated and he would have remained a threat to society. We reject this argument because the decision to forcibly medicate Jeff was made in a non-*parens patriae*, nonemergency situation and without consideration of an alternative treatment plan.

First, the *parens patriae* doctrine did not apply because Jeff was not adjudicated either legally or clinically incompetent under the Probate Act. (Ill. Rev. Stat. 1985, ch. 110½, par. 11a—3.) An involuntarily committed person is not necessarily legally incompetent. Ill. Rev. Stat. 1985, ch. 91½, par. 2—101.

Second, the evidence did not warrant the imposition of the police power. Dr. Tabin did not testify Jeff was currently a threat to himself or society and he could only hypothesize as to Jeff's future dangerousness. When the doctor was asked when he expected Jeff to harm someone, he replied "I—I can't answer that. *** I couldn't predict he would go out and harm someone today. I would say within the next month." We find suspect Dr. Tabin's comment that if "the police don't ever press charges *** it is best for [Jeff] and society he be put somewhere." This statement implied the request for authority to force medications was made to enable behavioral control and the elimination of "pestiness" and noncompliance with institutional rules, rather than to avoid an imminent threat of serious harm.

Finally, the record does not reflect the trial court or Dr. Tabin considered any treatment that would adequately serve the State's interest in protecting the public, other than the forcible administration of psychotropic drugs, even when the statute mandates that the court order the least restrictive alternative available. (Ill. Rev. Stat. 1985, ch. 91½, par. 3—811.) There was no discussion of alternative treatments available within the institution, the risk to Jeff in terms of side effects or long-term damage, the length of time the forced medication could be administered, or the emergency status of the situation. (See *In re Reliford* (1978), 65 Ill. App. 3d 177, 382 N.E.2d 72.) The only basis for the court's action was Dr. Tabin's gratuitous statement that Jeff's commitment would be to no avail unless the doctor was authorized to force medications. We assert Dr. Tabin's statement of medical need was insufficient. As the Arizona Supreme Court stated: "We are asked to rely on the unexplained and unarticulated judgment of the prescribing doctor that forced medications were appropriate and effective. Our constitution does not permit such blind reliance." *Large*

512

*v. Superior Court* (1986), 148 Ariz. 229, 238, 714 P.2d 399, 408.

▪ In sum, we declare a person subject to involuntary admission may refuse medical treatment under section 2—107 while hospitalized unless (1) under the *parens patriae* doctrine he has been adjudicated incompetent in a separate proceeding or (2) an emergency situation exists where the individual poses an *immediate* threat of physical harm to himself or others. In the latter scenario, psychotropic medications may be forcibly administered as a last resort, only after alternative treatment plans have been considered.

We conclude the trial court both exceeded statutory authority and failed to consider important factors and alternatives when it issued the order authorizing the State to forcibly medicate a person found subject to involuntary admission. While the error cannot be practically remedied at this time, we vacate the portion of the order authorizing the administration of medication and caution the trial court to avoid similar error in the future.

▪ A variety of courts have recognized that informed consent and the right to refuse medical treatment are concepts grounded in the common law right to be free from nonconsensual bodily invasions, the individual liberty interest in personal autonomy and bodily integrity, and the right to privacy protected by the United States and Illinois Constitutions. (*Charters*, 829 F.2d at 490-92; *Bee*, 744 F.2d at 1392-94; *Davis v. Hubbard* (N.D. Ohio 1980), 506 F. Supp. 915, 929-39.) Illinois courts have long recognized that involuntary hospitalization infringes on a person's basic liberty interests and therefore requires strict adherence to constitutional due process and statutory protections. (*Reliford*, 65 Ill. App. 3d 177, 382 N.E.2d 72; *In re Macedo* (1986), 150 Ill. App. 3d 673, 502 N.E.2d 72.) Even during involuntary hospitalization, an individual retains his liberty interests to remain free from unwarranted intrusions into his body and mind. *Mills v. Rogers* (1982), 457 U.S. 291, 73 L. Ed. 2d 16, 102 S. Ct. 2442; *Reliford*, 65 Ill. App. 3d 177, 382 N.E.2d 72.

The administration of psychotropic medications entails significant risks and side effects including tardive dyskinesia, an involuntary, uncontrollable and disturbing movement of limbs, tongue, and mouth which is irreversible and permanent. The temporary side effects include motor disfunctions such as parkinsonism (mask-like face, drooling, muscle stiffness, tremors, shuffling gate), and nonmuscular side effects including drowsiness, blurred vision, dizziness, dry mouth, loss of sexual desire, apathy, depression, and bowel disfunctions. (*Charters*, 829 F.2d at 483 n.2; Plotkin, *Limiting the Therapeutic Orgy: Mental Patients' Right to Refuse Treatment*, 72 Nw. U.L. Rev. 461,

475-76 (1978).) The Indiana Supreme Court found that a person medicated with antipsychotic drugs has a 50% risk of contracting tardive dyskinesia in addition to other unpleasant side effects. (*In re Mental Commitment of M.P.* (Ind. 1987), 510 N.E.2d 645, 646-47.) Tardive dyskinesia may appear in as few as six months in patients treated with psychotropic medications.

The record indicates Jeff was being treated with Loxitane (trade name for the generic loxapine) and lithium, which are medications listed as psychotropic drugs by the Department of Mental Health and Developmental Disabilities. (59 Ill. Adm. Code 112.80(c)(2) (Supp. 1987).) Jeff maintains he was capable of deciding whether the risk and discomfort associated with the psychotropic medications outweighed the proposed therapeutic benefits. The record does not indicate the risks, benefits, or alternatives were discussed so that Jeff could exercise informed consent or refusal. Jeff asserts his constitutional rights were violated.

The doctrine of informed consent imposes a duty on a physician to inform his patient of the risk involved with a particular treatment or surgery. A physician who intentionally performs non-emergency treatment upon a patient without his consent may be liable for battery. (*Mink v. University of Chicago* (N.D. Ill. 1978), 460 F. Supp. 713, 716-18.) Moreover, the Mental Health Code prohibits electroconvulsive therapy, or any other "hazardous" services, without "written and informed consent." (Ill. Rev. Stat. 1985, ch. 91½, par. 2—110.) Section 2—111 (Ill. Rev. Stat. 1985, ch. 91½, par. 2—111) explicitly provides an "exception to the consent requirement" in a medical emergency. Statutory sections concerning the same subject matter should be construed with reference to each other to determine legislative intent. (*Department of Revenue v. Smith* (1986), 150 Ill. App. 3d 1039, 501 N.E.2d 1370.) Accordingly, if section 2—107 is read with sections 2—110 and 2—111, it is apparent the drafters designed the statutory scheme to protect from nonconsensual treatment of any type. It is axiomatic then that informed consent must be given by an involuntarily admitted patient before the State authorities have the right to forcibly administer psychotropic medications in a non-emergency, non-*parens patriae* situation, especially given the long-term dangerous effects of psychotropic medicines.

The State's interest in public safety is not hindered by our holding. Dr. Tabin did not testify Jeff was so dangerous at the time of the commitment hearing to warrant an order allowing the State to give him psychotropic medication. If Jeff became dangerous while hospitalized, section 2—107 would have given hospital personnel the authority

to force medications, or the State had the option to petition to have Jeff adjudicated incompetent.

We find the Illinois Mental Health Code provides sufficient due process safeguards to protect the involuntary patient. Section 3—209 of the Mental Health Code requires review of a patient's treatment plan (Ill. Rev. Stat. 1985, ch. 91½, par. 3—209) and the right to refuse a particular course of treatment under section 2—107 necessarily includes refusal of psychotropic medications. (Ill. Rev. Stat. 1985, ch. 91½, par. 2—107.) Moreover, initial involuntary hospitalizations are limited to 60 days and additional periods of treatment cannot exceed 180 days. Ill. Rev. Stat. 1985, ch. 91½, par. 3—813.

Involuntary mental patients should not be treated with psychotropic medications on a long-term basis without the patient's informed consent or the consideration of less severe treatment plans. Section 112.90 of the Illinois Administrative Code regulates the treatment of patients treated with psychotropic drugs and provides for a review process (59 Ill. Adm. Code 112.90 (Supp. 1986)). Strict adherence to the Mental Health Code and this review procedure is necessary to protect the rights of persons involuntarily placed within the mental health system.

Affirmed in part; vacated in part.

GREEN, P.J., and LUND, J., concur.