*In re* DANIEL CLARK, a Person Found Subject to Involuntary Admission (The People of the State of Illinois, Petitioner-Appellee, v. Daniel Clark, Respondent-Appellant).

Fourth District   No. 4—92—0469

Opinion filed June 24, 1993.

D. Peter Wise and Frederick J. Schlosser, both of Metnick, Barewin, Wise & Cherry, of Springfield, for appellant.

Donald M. Cadagin, State's Attorney, of Springfield (Norbert J. Goetten, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

Respondent, Daniel Clark, appeals from the entry of an order of involuntary admission by the Sangamon County circuit court. (Ill. Rev. Stat. 1991, ch. 91½, pars. 3—601, 3—701.) He argues his involuntary admission was improper because the State did not follow statutory procedures and the evidence was insufficient to establish he could be expected to be a danger to himself or others. We disagree and affirm.

I. FACTS

Respondent was involuntarily admitted to the Andrew McFarland Mental Health Center (McFarland) in December 1990. Successive petitions for continued involuntary admission were filed, with this petition filed April 14, 1992. The petition sought involuntary admission pursuant to sections 3—601 and 3—701 of the Mental Health and Developmental Disabilities Code (Code) (Ill. Rev. Stat. 1991, ch. 91½, pars. 3—601, 3—701).

The petition was signed by Sherry Frederickson on April 13, 1992, at 3 p.m. It was filed with one certificate prepared by Dr. David Gilliland, who had examined respondent at 11 a.m. on April 14, 1992. A second certificate prepared by a psychiatrist who examined respondent at 4 p.m. on April 14 was filed April 15.

Before the April 24 hearing, respondent attacked his involuntary commitment on procedural grounds. He argued the State failed to timely prepare and file the certificates indicating commitment was necessary. He also argued he did not receive proper notice of the hearing. The State sought permission to amend the petition and to proceed pursuant to section 3—813 of the Code (Ill. Rev. Stat. 1991, ch. 91½, par. 3—813).

The trial judge allowed the State to proceed under section 3—813, reasoning that the only requirements under the provision are that a petition and two certificates be filed within 180 days of a patient's prior involuntary admission. At the hearing, Gilliland, a psychologist who had treated respondent since respondent's voluntary admission to McFarland in May 1989, began his testimony by recounting respondent's psychological history indicated in his medical records. The trial judge sustained respondent's objection to this testimony, reasoning that although relevant, the State should not rely on evidence about respondent's psychological or social history which occurred more than 10 years ago.

According to Gilliland's review of respondent's more recent medical records, respondent requested medication to alleviate stress, talked to himself, was nude on several occasions when female nurses checked his room, and did not follow McFarland rules. Gilliland testified respondent's current diagnosis was that he had a schizo-affective disorder.

Gilliland also stated respondent's medical reports indicated he was hearing and responding to voices and he had threatened another patient. Gilliland opined respondent would inflict serious harm upon others in the near future and continued commitment was the least restrictive treatment for respondent.

During cross-examination, Gilliland stated respondent had taken an interest in his medication by sometimes requesting increases or decreases. Gilliland also conceded respondent's medication, Prolixin Enanthate (Prolixin), could be administered on an outpatient basis. Gilliland also agreed respondent continued to have a strong interest in his farming operation and wanted to return to farming upon his release.

Upon inquiry by the trial judge, Gilliland initially stated he did not know whether there was an alternative to respondent's involuntary admission which would require respondent to voluntarily return to McFarland for his medication every three weeks and to also be subject to drug testing for alcohol or substance abuse. However,

upon further questioning by the State, Gilliland opined that outpatient treatment was not a sufficient alternative for respondent.

Doctor Shan Suneja, respondent's treating physician for the past year and a licensed psychiatrist, testified respondent had not demonstrated any symptoms during their hour-long sessions in April, May, and June 1991. In July 1991, Suneja began reducing respondent's medication from one cc to one-fourth cc of Prolixin. In October, respondent's medication was increased to one-half cc Prolixin, and then to one cc, upon his request. Respondent approached Suneja several weeks later and sought a reduction in his medication because he was feeling less stressful. Respondent was then given his medication every three weeks rather than every two weeks.

According to Suneja, respondent suffers from a schizo-affective disorder. Symptoms of respondent's disorder are manifested in hearing voices, talking to oneself, inappropriate laughter, and isolation. When asked if respondent could reasonably be expected to inflict serious physical harm upon others in the near future, Suneja stated there were several factors indicating respondent would be dangerous, while other factors indicated he would not. Personal factors indicating potential dangerousness included (1) respondent experienced violent behavior more than 10 years ago, (2) he did not regret this behavior, (3) he had previous alcohol and substance abuse problems, and (4) he lacked respect for McFarland's rules. Suneja noted several environmental factors could result in respondent's potential for violent behavior upon release, including returning to his farm near his father's relatives and the ease with which a weapon could be acquired.

Suneja also outlined factors which indicated respondent would not be violent upon release: respondent (1) had followed unit rules for a long time, (2) had not struck anyone for a long time, (3) told Suneja he was not going to be involved in any more violence because he did not want to go back to prison, and (4) responds well to his medication and treatment. According to Suneja, respondent would not refuse to take his medication if he had a choice.

In his master treatment plan review, Suneja indicated respondent was struck by a fellow patient in February 1992 and that respondent was "reluctant to seek redress." Suneja also indicated respondent appeared "extremely fearful of his alleged attacker." He also noted respondent enjoys hard rock music and limited association with select peers. Under "supervision level," Suneja wrote: "[Respondent] underutilizes his privileges but occasionally attends

off-unit rehab programming without incident. He required no off grounds medical care and appears to be a minimal elopement risk."

The trial judge concluded the need to involuntarily commit respondent was established by clear and convincing evidence. The evidence showed respondent had a mental illness and he was reasonably expected, in the near future, to engage in conduct which is dangerous to others. Involuntary commitment was viewed as the least restrictive alternative.

## II. Alleged Deficiencies In Proceedings

Respondent raises two arguments on procedural deficiencies in his involuntary commitment proceedings, *i.e.*, the State failed to comply with sections 3—703 and 3—705 of the Code, which require the appointment of a psychiatrist by the court and 36 hours' notice to respondent of the court-mandated examination. He also argues the State failed to comply with section 3—810, which requires the Department of Mental Health and Developmental Disabilities to file a detailed report for the court to consider before disposition of the case.

The State contends the proper procedures were followed.

### A. *Court-Appointed Psychiatrist Not Required*

■■ Section 3—703 of the Code states, in pertinent part:

"If no certificate was filed, the respondent shall be examined separately by a physician, or clinical psychologist, or qualified examiner and by a psychiatrist. *** If, as a result of an examination, a certificate is executed, the certificate shall be promptly filed with the court." Ill. Rev. Stat. 1991, ch. 91½, par. 3—703.

Respondent contends his commitment must be reversed because, although he was evaluated by a psychiatrist, the trial judge did not order the evaluation. Section 3—703 requires only that a certificate be filed by a psychologist and a psychiatrist. It does not require these examinations be performed only after a court order is entered. Respondent's continued involuntary commitment was sought pursuant to section 3—813(a) of the Code:

"An initial order for hospitalization shall be for a period not to exceed 180 days. Prior to the expiration of the initial order if the facility director believes that the recipient continues to be subject to involuntary admission, a new petition and 2 new certificates may be filed with the court." Ill. Rev. Stat. 1991, ch. 91½, par. 3—813(a).

In this case, a new petition and two certificates, one from a psychologist and one from a psychiatrist, were filed within 180 days of the last commitment order. The Code does not mandate the psychiatrist's certificate (in this case filed by a "Doctor Kleinplatz") be filed pursuant to a court order. Section 3—813 contemplates the petition and certificates can be filed by the mental health facility *before* any court action must transpire.

Moreover, section 3—702(b) of the Code also indicates a court order is not required before evaluation:

> "Upon receipt of the petition either with or without a certificate, if the court finds the documents are in order, it *may* make such orders pursuant to Section 3—703 as are necessary to provide for examination of the respondent. If the petition is not accompanied by 2 certificates executed pursuant to Section 3—703, the court *may* order the respondent to present himself for examination at a time and place designated by the court. If the petition is accompanied by 2 certificates executed pursuant to Section 3—703 and the court finds the documents are in order, it *shall* set the matter for hearing." (Emphasis added.) Ill. Rev. Stat. 1991, ch. 91½, par. 3—702(b).

This language indicates a trial judge must schedule a hearing when the required documentation is prepared. He may require the respondent to submit to an examination when two proper certificates *do not* accompany the petition. That respondent was evaluated by Dr. Kleinplatz absent a court order is not fatal to respondent's commitment proceedings.

### B. *Notice to Respondent*

█ Respondent directs this court to section 3—705 of the Code in arguing he was not provided sufficient notice of the evaluation by the psychiatrist. This provision states:

> "At least 36 hours before the time of the examination fixed by the court, a copy of the petition, the order for examination, and a statement of rights as provided in Section 3—205 shall be personally delivered to the person ***." Ill. Rev. Stat. 1991, ch. 91½, par. 3—705.

He contends his commitment must be reversed because the trial judge failed to provide him with an order for examination within 36 hours before the examination was performed. He also contends reversible error occurred because he was not provided a copy of the petition within 36 hours of the examination and was not provided a

statement of rights as mandated by section 3—205 of the Code (Ill. Rev. Stat. 1991, ch. 91½, par. 3—205). The record indicates he was provided a copy of the petition on April 13, 1992, at 3:30 p.m. He was examined by a psychiatrist on April 14, 1992, at 4 p.m.

Respondent's examination was not performed pursuant to a court order. By its terms, the procedures mandated by section 3—705 of the Code apply to court-ordered examinations. Respondent's proceedings complied with the requirements of section 3—813 of the Code.

## C. *Treatment Plan*

■ The State initially argues respondent waived review of this issue by not raising it at the trial level. It contends *In re James* (1989), 191 Ill. App. 3d 352, 357, 547 N.E.2d 759, 762, is distinct because this court of review considered an issue under a doctrine analogous to plain error. In *James*, no report was filed. Although a report was filed in the present case, if it was—as respondent contends—inadequate to determine the propriety of continuing his involuntary commitment, this deficiency was prejudicial to respondent. For this reason, and because the error would have been apparent from the face of the record and respondent's liberty interests are involved, we will address the merits of respondent's claim. *In re Adams* (1993), 239 Ill. App. 3d 880, 883-84, 607 N.E.2d 681, 683-84.

Before the propriety of the involuntary commitment petition is determined, section 3—810 of the Code provides the following guideline for the requisite report:

"[T]he facility director or such other person as the court may direct shall prepare a report including information on the appropriateness and availability of alternative treatment settings, a social investigation of the respondent, a preliminary treatment plan, and any other information which the court may order. The treatment plan shall describe the respondent's problems and needs, the treatment goals, the proposed treatment methods, and a projected timetable for their attainment." Ill. Rev. Stat. 1991, ch. 91½, par. 3—810.

■ The report included in the record consists of (1) a "summary of comprehensive evaluation and social investigation," (2) a "comprehensive treatment plan," indicating goals and functioning levels as of April 8, 1992, (3) a "master treatment plan review" dated March 11, 1992, (4) the initial March 24, 1989, "treatment plan," and (5) psychiatric updates from April 10, 1991, and Novem-

ber 11, 1991. These reports were entered into evidence as the State's exhibit No. 1. The reports indicate the respondent's diagnosis, his needs, and treatment. They also indicate respondent's behavior while in the hospital. The treatment indicates the use of medication and individual counseling. This information meets the requisites of section 3—810.

Respondent also argues the report is deficient because Sharon Frederickson, and not the facility director, filed the social investigation. Respondent contends section 3—810 of the Code requires the report be filed by the facility director. He also contends Suneja had no authority to file the report which indicated his recommendations. However, for purposes of the Code, "facility director" is defined as:

> "[T]he chief officer of a mental health or developmental disabilities facility or his designee or the supervisor of a program of treatment or habilitation, or his designee. Designee may include a physician, clinical psychologist, social worker, or nurse." Ill. Rev. Stat. 1991, ch. 91½, par. 1—104.

Frederickson was a licensed social worker at the facility. She was authorized to file such a report. Suneja was respondent's treating physician and, as such, could also file a report.

Finally, respondent argues even if the report was sufficient, the record does not indicate the trial judge considered it before concluding commitment was necessary. This claim is unsupported by the record. The record indicates before the trial judge pronounced judgment, he expressly referred to the State's exhibit which outlined respondent's treatment plan.

### III. SUFFICIENCY OF EVIDENCE TO SUPPORT CONTINUED COMMITMENT

Respondent finally argues the trial judge erred by authorizing the continuation of his involuntary admission because the State failed to prove by clear and convincing evidence that he could reasonably be expected to inflict serious physical harm on himself or another in the near future.

A trial court's determination of whether the evidence is sufficient to continue involuntary commitment is given great deference because it had the opportunity to view the witnesses, determine their credibility, and weigh the evidence. (See *In re Knapp* (1992), 231 Ill. App. 3d 917, 919, 596 N.E.2d 1171, 1172; *In re Biggs* (1991), 219 Ill. App. 3d 361, 363, 579 N.E.2d 1170, 1172.) We will not disturb a trial judge's ruling unless it is against the manifest weight of the evidence. The evidence must clearly establish a con-

trary result was proper. *Knapp*, 231 Ill. App. 3d at 919, 596 N.E.2d at 1172.

■ A person may be subjected to involuntary commitment when the evidence is clear and convincing that (1) he suffers from a mental disease or defect which (2) makes it reasonably possible he will inflict serious physical harm on himself or another. (*In re Orr* (1988), 176 Ill. App. 3d 498, 504, 531 N.E.2d 64, 69; *Knapp*, 231 Ill. App. 3d at 920, 596 N.E.2d at 1173.) Commitment need not be delayed until the danger is acute or someone is actually harmed. *Knapp*, 231 Ill. App. 3d at 920, 596 N.E.2d at 1173; *In re Mazzara* (1985), 133 Ill. App. 3d 146, 150, 478 N.E.2d 567, 569.

■ Suneja testified respondent could be prone to violent outbreaks. Gilliland testified such an outbreak is a symptom of respondent's disorder considering his mood, anger, and agitation factors. Respondent has also disobeyed the rules at McFarland. He has been found with contraband in his room, he has used foul language, and has exposed his genitals to female staff members. When defendant was confronted with breaking the rules, he replied, "[t]o hell with the rules." According to testimony at the hearing, his noncompliance with rules could be related to mood disturbance, antisocial personality, and schizo-affective disorder.

Respondent has been housed on a more restrictive ward and has not been granted more privileges because of his noncompliance. His lack of ability to control his impulses in a controlled setting raises legitimate concerns about his behavior outside that setting.

The record also indicates respondent has a long, and current, history of violence, beginning when he was convicted of the involuntary manslaughter of his father in 1981. As recently as November 1991 he threatened to kill a staff member of the hospital. He has repeatedly made similar threats. These threats, according to Gilliland, are consistent with respondent's mental disorder. Respondent had earlier tried to hire someone to kill another individual while he was in the hospital.

Gilliland testified that respondent needed treatment and could reasonably be expected to harm himself or others within the near future based on his illness and condition. Due to respondent's mood disturbance, if his mood became agitated, he could act on his anger and cause harm to others. According to Gilliland, there was no less restrictive form of treatment available for respondent. He also opined it would be difficult to construct an order which required respondent to return to the hospital periodically for medication because of the problem of enforcement. Finally, Gilliland saw a prob-

lem releasing respondent from the hospital with his medication because of respondent's behavior while in the hospital.

Suneja also opined there was no less restrictive treatment suitable for respondent. This opinion was due to respondent's potential to be dangerous if released from the restrictive environment of the hospital. According to Suneja, out of 14 factors used to determine potential for dangerousness, respondent possessed 10. Relevant factors included respondent's past history of violent behavior, his lack of remorse or empathy for his past conduct, history of alcohol and substance abuse, his desire to be taken off the medication which helps his condition, and disregard for rules of the hospital.

Suneja also indicated other environmental factors to be considered in determining dangerousness included the fact respondent would return to his home where he would be confronted with relatives he does not get along with, the availability of weapons, and the fact respondent had tried to hire someone to hurt another person while he was in the hospital. Suneja opined respondent's reason for not being involved in violence anymore was not a proper reason. Respondent said he would not do so because he did not want to go to prison.

Although respondent had not physically hit anyone in six months to a year, his reason for avoiding violent tendencies indicates if he could find a way to avoid being caught, he might continue to be violent. It does not indicate respondent currently grasps reasons for avoiding violence.

Where there is evidence of prior dangerous conduct and evidence respondent remains in need of mental treatment, the commitment order is proper. (*Orr*, 176 Ill. App. 3d at 505, 531 N.E.2d at 69; *In re Williams* (1987), 151 Ill. App. 3d 911, 921, 503 N.E.2d 816, 822-23.) Testimony at respondent's involuntary commitment hearing established he had previously been prone to violent conduct. In addition, the professionals involved in respondent's treatment opined there was no less restrictive means to provide respondent the necessary treatment and protect himself and society from danger.

Respondent's argument he was being kept at the hospital only because of his remote history of violence fails. The trial judge agreed with his objection to testimony about his mental history more than 10 years ago and indicated recent occurrences were most important. The more remote history of violence, although relevant, was only one of numerous factors which the trial judge considered.

Respondent recently disregarded hospital rules and was observed apparently hearing voices and responding. His disregard for the rules and his lack of impulse control are also important. His behavior in the hospital, while on medication, indicated he may engage in dangerous conduct if released from the secure setting of the hospital.

## IV. CONCLUSION

The trial judge's findings that respondent was in need of mental treatment and continued to pose a risk of danger to others due to his mental illness were not against the manifest weight of the evidence. The procedures followed to continue respondent's involuntary commitment were proper.

Affirmed.

COOK and GREEN, JJ., concur.