*In re* LARRY BYRD.—(THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LARRY BYRD, Defendant-Appellant.)

First District (2nd Division)    No. 78-223

Opinion filed January 16, 1979.—Modified on denial of rehearing March 13, 1979.

James J. Doherty, Public Defender, of Chicago (Brian L. Heise and Timothy P. O'Neill, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Rimas F. Cernius, and Terry Gillespie, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DOWNING delivered the opinion of the court:

The circuit court of Cook County found 19-year-old Larry Byrd in need of mental treatment and committed him involuntarily to a State mental health hospital.

The sole issue on review is whether the trial court properly denied Byrd's petition for voluntary commitment pursuant to section 3—5 of the Mental Health Code of 1967. Ill. Rev. Stat. 1977, ch. 91½, par. 3—5.

Larry Byrd was arrested and incarcerated for discharging a firearm. While incarcerated, he attempted to hang himself with his shirt. On November 10, 1977, Byrd was transferred to the Chicago Read Mental Health Center pursuant to emergency admission procedures under article VII of the Mental Health Code of 1967. Ill. Rev. Stat. 1977, ch. 91½, par. 7—1 et seq.

A petition for hospitalization, filed in the circuit court on November 14, 1977, asserted that Byrd was in need of mental treatment and likely to harm himself or others if not immediately hospitalized. Two doctors filed certificates in support of the petition. Dr. R. Carreria, a psychiatrist who examined Byrd on November 9, 1977, found him to have an explosive personality with antisocial traits, likely to harm himself or others, and in need of mental treatment. A day later Byrd was examined by another psychiatrist, Dr. Lee, who found him suffering from auditory and visual hallucinations, in need of mental treatment, and likely to harm himself or others.

A hearing on the petition was held on November 17, 1977. Two days prior to this hearing, Byrd filed an application for voluntary admission which was witnessed by Dr. Lee. Before the hearing commenced, the

State objected to Byrd's petition for voluntary admission and the trial court reserved its ruling.

Thomas Cotton, a rehabilitation counselor for the Department of Mental Health who had interviewed Byrd, testified as a State witness that Byrd told him that he had been taking drugs and drinking the day he was arrested for firing a gun into the air, and that he had been in a psychiatric hospital at the age of 10. Cotton also testified that Byrd told him he wanted to enter the hospital as a voluntary patient, and in Cotton's opinion, Byrd could benefit from hospitalization.

Over objection by the public defender, the State was allowed to call Byrd as a witness pursuant to section 60 of the Civil Practice Act. (Ill. Rev. Stat. 1977, ch. 110, par. 60.) Byrd stated that within the previous week he tried to strangle and choke himself. When asked the reason, he responded he really did not know how to answer that question. When asked if he would try to kill himself again if not hospitalized, he responded that he did not know.

The State called the only physician to testify at the hearing, Dr. Newena Argiroff, a psychiatrist. She had conversed with Byrd the previous day and the morning of the hearing. Byrd told her he had been hospitalized at the age of 7 for shooting his father. The reason he gave, Argiroff said, was that his father was attacking his mother and he could not tolerate his father's brutality. According to Argiroff, Byrd told her he had taken all kinds of drugs including marijuana, L.S.D., and cocaine, and drank heavily at times. Argiroff testified that while talking, Byrd was smiling and was almost euphoric in an exhibitionistic way, as if he wanted to show what he could do and create a certain impression. She stated that Byrd's contact and orientation were good, but his judgment and insight were very poor. He was evasive and guarded and gave answers with some manipulative behavior. Argiroff diagnosed Byrd as suffering from a personality disorder with explosive and antisocial trends and drug abuse. As a result of this disorder, she concluded that Byrd could more likely than not harm himself or others and was in need of hospitalization.

At the close of Dr. Argiroff's direct examination, the defense renewed its motion for voluntary commitment. The trial court stated the following:

"Well, from the evidence I've heard, signing the voluntary is one thing. This young man came here from California. There is no evidence here of any ability to work or disability not to work or whatever you want to classify it as. He should be classified a non-resident, sent back to California. I don't know why we should take the responsibility for this young man."

The trial court asked the defense whether they had contacted anyone in California. The defense informed the court that the only family Byrd had was a sister who had lived in California and was now in the army and

living in Germany. Without stating a reason, the court denied the motion for voluntary admission.

Byrd testified in his own behalf that he was 19 years old, drove a tractor-trailer for a moving company located in Texas before coming to Chicago; that he had no permanent home; that he benefited somewhat from his present hospital treatment; and that the medication given him did help. Byrd stated that he wanted to stay in the hospital a little longer to get himself together, and that he did sign voluntary admission papers. The court asked Byrd if he wanted to go back to California, to which he responded that he would rather get himself back together and then return to California.

Upon cross-examination by the State, Byrd stated that by attempting to hang himself, he was not trying to get out of jail and into the hospital, but that he wanted to kill himself and still had the intention of doing so. He responded negatively when asked whether he had ever avoided arrest in the past by attempting suicide.

Thereafter, the defense again renewed its motion for voluntary admission. The trial court denied the motion without stating its reason, classified Byrd as a nonresident, and said, "Let the interstate take him back to California if they want to."

On November 17, 1977, the court entered its order finding Byrd in need of mental treatment and involuntarily committing him to Manteno State Hospital.

I.

Relying on section 3—5 of the Mental Health Code of 1967 (Ill. Rev. Stat. 1977, ch. 91½, par. 3—5), Byrd contends that his petition for voluntary admission was improperly denied. Section 3—5 provides as follows:

> "Any person may request to become an informal or voluntary patient under Article IV or Article V of this Act at any time prior to a court entering an order adjudicating him to be in need of mental treatment and if the person becomes such a patient, the court shall dismiss any pending proceedings, but that when proceedings have been instituted pursuant to Articles VII or VIII of this Act, the court may require proof that such dismissal is in the best interest of that person and of the public."[1]

---

[1] We note this section has recently been repealed. The statute now provides the following effective January 1, 1979:

"A respondent may request admission as an informal or voluntary patient at any time prior to an adjudication that he is subject to involuntary admission. If the facility director approves such a request, the court may dismiss the pending proceedings but may require proof that such dismissal is in the best interest of the respondent and of the public." (1978 Ill. Legis. Serv. 1026 (West) (to be codified as Ill. Rev. Stat., ch. 91½, par. 3—801.))

■■ The proceeding in the present case was instituted pursuant to article VII of the Act. (Ill. Rev. Stat. 1977, ch. 91½, par. 7—1.) In such an instance, section 3—5 provides that before the proceeding is dismissed and the voluntary admission petition granted, the court may require proof that such dismissal is in the best interest of the individual and the public. Use of the word "may" gives the court discretionary power to require such proof.

Prior to the hearing on the emergency admission, Byrd filed his application for voluntary admission under article V of the Act. Ill. Rev. Stat. 1977, ch. 91½, par. 5—1.

The State agrees that the statute allows the court to require proof, under section 3—5, that society or the individual would benefit by dismissal of the proceeding, but argues that since no such evidence was presented and the finding that Byrd was in need of mental treatment and likely to harm himself or others was in accordance with the Mental Health Code of 1967 (Ill. Rev. Stat. 1977, ch. 91½, pars. 9—5, 9—6, 1—11), the petition for voluntary admission was properly denied.

Section 9—5 of the Act provides in pertinent part: "If any person is found * * * to be in need of mental treatment * * * and the court so finds, then the court shall enter an order so specifying." Section 9—6 in pertinent part provides: "If any person is finally found to be in need of mental treatment * * * the court, as part of the hearing shall consider the alternative forms of care or treatment which are desirable for and available to the patient, including but not limited to hospitalization." Section 1—11 defines a person in need of mental treatment as "any person afflicted with a mental disorder, * * * if that person, as a result of such mental disorder, is reasonably expected at the time the determination is being made or within a reasonable time thereafter to intentionally or unintentionally physically injure himself or other persons, or is unable to care for himself so as to guard himself from physical injury or to provide for his own physical needs."

A person must be found in need of mental treatment by clear and convincing evidence. (*In re Stephenson* (1977), 67 Ill. 2d 544, 556-59, 367 N.E.2d 1273.) The Illinois Supreme Court in the case of *In re Stephenson*, at page 554, recognized a fundamental liberty interest of the person found in need of mental treatment and emphasized the importance of providing the most beneficial type of treatment with the minimum amount of confinement consistent with the protection of the public. Section 9—6 of the Act as quoted above also reflects this concern. See *In re Reliford* (1978), 65 Ill. App. 3d 177, 183, 382 N.E.2d 72, 77.

Byrd does not challenge the court's finding that he was in need of treatment. He in fact requested admission to the hospital. What he does challenge is the basis upon which his voluntary admission petition was denied.

■ Both the United States Constitution and the Illinois Constitution provide that no person shall be deprived of life, liberty, or property without due process of law. (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2.) Involuntary commitment of an individual for any reason is a deprivation of that individual's liberty. (*In re Reliford* (1978), 65 Ill. App. 3d 177, 182, 382 N.E.2d 72, 76.) Before one is committed involuntarily, the reasons for that commitment must be established in an appropriate proceeding. (*O'Connor v. Donaldson* (1975), 422 U.S. 563, 580, 45 L. Ed. 2d 396, 95 S. Ct. 2486 (Burger, J., concurring).) Thus the evidence must show why seeking treatment voluntarily was not adequate and still necessitated an involuntary commitment.

■ We think that before a trial court would deny a voluntary commitment petition and order involuntary commitment, the trial court should hear evidence as to the advisability of voluntary admission. Generally, testimony from a physician is heard as to the advisability of voluntary admission. "The physician will normally recommend that the patient be allowed to admit himself on a 'voluntary' basis if the person recognizes that he has a problem and wishes to remain in the hospital for treatment. If the physician feels that the person will immediately sign a request to leave or if the person has a history of frequent unauthorized absences, he will probably not recommend that the person be admitted on a 'voluntary' basis." (Beis, *Civil Commitment: Rights of the Mentally Disabled, Recent Developments and Trends,* 23 DePaul L. Rev. 42, 59 (1973).) In fact, Beis suggests that the mental health professionals consider the voluntary admission to a mental hospital far more beneficial to a person than an involuntary admission. Beis, at 51.

The record in the present case indicates that Byrd had been institutionalized at a young age. However, no evidence was presented that he had been institutionalized since that time. Byrd recognized his need for treatment and requested it. He did not want to be sent back to California before he had received this treatment. The only physician to testify was not asked an opinion as to whether Byrd should be admitted voluntarily or involuntarily. In fact, no evidence concerning the most beneficial type of admission was presented. We find nothing in the record to indicate the basis for the denial of the voluntary petition.

■ The State suggests that the reason can be found in the fact that if Byrd was allowed to enter the hospital voluntarily, he could release himself by merely giving five days notice of his intention to do so. (Ill. Rev. Stat. 1977, ch. 91½, par. 5—3.) The State argues that release from hospitalization should be determined by the hospital and not the patient. Section 5—3 does provide that a voluntary admittee shall be allowed to leave the hospital within five days after he gives any professional staff person written notice of his desire to leave. However, that section goes on to state that during the five day notice period, the hospital officials may

ask a court to hold an involuntary commitment hearing, which must be set within five days after such petition. The patient continues to be hospitalized pending a final order of the court at the hearing. Thus a voluntary admission, although initially a voluntary decision on the part of the patient, is not without subsequent restraints. Therefore, even if Byrd as a voluntary admittee could seek his release by filing a five-day notice, we believe that fact alone should not prevent him from exercising his right to avail himself of the statutory right to seek a voluntary admission. ■ For the foregoing reasons, the order of the circuit court of Cook County is reversed and the cause is remanded for a hearing on whether, under section 3—5, the involuntary commitment of Larry Byrd was in his best interest and the best interest of the public.

Judgment reversed and remanded.

STAMOS, P. J., and PERLIN, J., concur.