*In re* TERENCE RUSICK—(The People of the State of Illinois, Petitioner-Appellee, *v.* Terence Rusick, Respondent-Appellant).

Fifth District   No. 82—181

Opinion filed May 13, 1983.

Frederick R. Firestone, of Guardianship & Advocacy Commission, of Alton, for appellant.

Don W. Weber, State's Attorney, of Edwardsville (Stephen E. Norris and Mary W. Richardson, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE JONES delivered the opinion of the court:

Following a hearing the trial court ordered that the respondent, Terence Rusick, was a person subject to involuntary admission and that he be hospitalized in the Department of Mental Health and Developmental Disabilities. At the hearing respondent testified in his own behalf in an effort to persuade the court to permit him to be admitted voluntarily. The trial court subsequently denied respondent's motion to vacate the judgment for involuntary admission and to allow

his petition for voluntary admission. He appeals raising a single issue: "[w]hether the trial court erred in denying respondent his statutory right as due process of law in not allowing respondent to become a voluntary patient."

Apparently because of inaudibility, the transcript of the hearing contains omissions, some rather serious, in the testimony of all three of the witnesses. The testimony of the first witness, Dr. Carmen Ferro, for example, who is described in respondent's brief as "a psychiatrist at Alton Mental Health Center," begins with an instruction from the bench: "Continue Doctor." Neither party has provided us with the substance of any of the omitted testimony.

Dr. Ferro testified that she "recommend[ed] commitment so we can treat him properly and discharge him when he's ready without having him request release. His judgment is very poor, so I think it is therefore against my recommendation to let him sign for himself." She diagnosed respondent as suffering from "Schizophrenia-paranoid type" and described his thinking as "so delusional that he distorts reality." On cross-examination counsel for respondent asked, "You mentioned previous occasions when Mr. Rusick had come in as a voluntary patient. Had he requested to leave soon thereafter?" Although the witness answered in the affirmative, the transcript contains nothing on direct examination with regard to respondent's prior voluntary admissions. She indicated that "the last two admissions" of respondent had occurred in April and June of 1981, that they had been voluntary, and that he had requested his release following admission. Although there is little indication in the record of how long he had been hospitalized on these two occasions before he asked to be released, the following colloquy between respondent's attorney and the witness is somewhat illuminating:

"Q. But isn't this case a little bit different because unlike some situations where Mr. Rusick might ask to sign a voluntary after he was brought in from emergency admission, Mr. Rusick approached St. Elizabeth's Hospital and asked to sign a voluntary admission?

A. Yes this case is different in a way that I know this case for many years [sic] and I know more or less what his behaviour has been, being past history, and I know that he would be requesting his release within a few days and he's not ready to be discharged.

Q. Has he told you he'd be requesting his release within a few days?

A. No, but I know the ways he has been—

110

Q. Has he told you he wants to be treated and wants to become better and that's why he wants to be here?

A. Sometimes he comes and says he wants to be treated. Sometimes he says he's better already and he's ready to leave."

Respondent had told her the day before that he was "much better" but had not asked her if he could leave. Respondent appears to have sought treatment at St. Elizabeth's Hospital on January 4, 1982, 10 days before the hearing on January 14, and to have been transferred to the Alton Mental Health Center. Earlier, in response to the question on cross-examination of whether it is "generally considered good for the patient if he decides to sign himself in voluntarily," Dr. Ferro answered, "To [sic] some patients, yes," adding, "Usually when you let somebody sign it [sic] voluntarily *** you consider their judgment to be fairly good." The respondent had been on suicidal precautions when first admitted because he had admitted to being "very depressed" and had been "considering different ways of killing himself." Dr. Ferro testified that respondent usually responds well to medication but that "outside" the facility, he stops taking it.

The other witness called by the State was Mary Gibbons, described in respondent's brief as a "hospital employee." Her testimony, like that of Dr. Ferro, begins *in media res*. Of "one of the last readmissions" of the respondent she testified on direct examination as follows:

"I don't remember—recall any unauthorized absences but he did [inaudible] before we felt he was ready. And on one occasion—I don't have a date; it's in the charts—he had hurt his arm, broke his hand, from hitting another client, had to be under restraints from threatening that and other clients, tore the cast off—which the doctor had put on—and signed his request for release to leave the hospital."

Asked on cross-examination whether respondent had told her that "he wants to be treated, he wants treatment, he wants you to help him," the witness answered, "He'll do that one minute, the next minute he says he's ready to kill himself. He's very changeable." The witness indicated that her concern about allowing respondent to be admitted voluntarily stemmed in part from the fluctuations in his state of mind and, accordingly, in his behavior. Although his behavior at the time he sought release following a voluntary admission might be such that he could not be admitted involuntarily, he would not be well enough to be discharged and might, once discharged, "tak[e] an overdose."

Testifying in his own behalf, the respondent, when asked on direct

examination whether he wanted to be a voluntary patient, answered, "Sure, I want to get well." The following appears to be in reference to a part of Ms. Gibbons' testimony absent from the transcript:

"Q. [Respondent's attorney] Ok. You heard Miss Gibbons testify that yesterday you told her that you wanted to leave the hospital. Is that true?

A. Yesterday I said that?

Q. Today.

A. No, she told me that. She said that I was well enough to leave. I didn't say that. She told me that.

Q. How do you feel now? Would you like to be a voluntary patient?

A. Yes.

Q. Would you sign out tomorrow if you were a voluntary patient?

A. No, I want to get well."

Section 3—801 of the Mental Health and Developmental Disabilities Code (Ill. Rev. Stat. 1981, ch. 91½, par. 3—801) (hereafter referred to as the Code) provides:

"A respondent may request admission as an informal or voluntary patient at any time prior to an adjudication that he is subject to involuntary admission. If the facility director approves such a request, the court may dismiss the pending proceedings but may require proof that such dismissal is in the best interest of the respondent and of the public."

Respondent relies heavily on *In re Byrd* (1979), 68 Ill. App. 3d 849, 386 N.E.2d 385, which was governed by section 3—5 of the Mental Health Code of 1967 (Ill. Rev. Stat. 1977, ch. 91½, par. 3—5), providing as follows:

"Any person may request to become an informal or voluntary patient under Article IV or Article V of this Act at any time prior to a court entering an order adjudicating him to be in need of mental treatment and if the person becomes such a patient, the court shall dismiss any pending proceedings, but that when proceedings have been instituted pursuant to Articles VII or VIII of this Act, the court may require proof that such dismissal is in the best interest of that person and of the public."

Byrd had filed an application for voluntary admission two days before the hearing in which he was found by the trial court to be mentally ill and was admitted involuntarily to a mental health hospital. In *Byrd*, as in the case at bar, the appellant did not challenge the trial court's ruling that he was in need of treatment. As in the case at bar, the

appellant challenged the basis upon which his petition for voluntary admission was denied. On appeal the judgment of the trial court was reversed. Although the 19-year-old appellant in *Byrd* had been institutionalized at a "young age" (68 Ill. App. 3d 849, 854, 386 N.E.2d 385, 389), no evidence was presented that he had been institutionalized since that time. Further, the only physician to testify was not asked an opinion as to whether Byrd should have been admitted voluntarily or involuntarily, and no evidence concerning the most beneficial kind of admission was presented. There was, in *Byrd*, "nothing in the record to indicate the basis for the denial of the voluntary petition." 68 Ill. App. 3d 849, 854, 386 N.E.2d 385, 389.

In the case at bar the State relies upon the more recent case of *In re Hall* (1981), 92 Ill. App. 3d 1136, 416 N.E.2d 731, which respondent does not cite, in which Hall was the subject of a petition for involuntary admission to a mental health facility. Before the hearing commenced Hall moved to dismiss the involuntary proceeding and to be admitted as a voluntary patient. On review the court affirmed the denial of Hall's motion for voluntary admission. In *Hall* the respondent likewise relied on *Byrd*. However, the operative provision of the Code in *Hall*, as in the instant case, was not section 3—5 of the Mental Health Code of 1967, as it was in *Byrd*, but section 3—801 of the Code, which became effective on January 1, 1979. The court in *Hall* noted that the Code has added a requirement not present in the earlier one, namely, the approval of the facility director. The record in *Hall* contained no such approval, nor does the record in the instant case. In *Hall*, as in the instant case and unlike the situation in *Byrd*, the respondent had a recent history of hospitalization. Further, in *Hall*, although there was no direct evidence on the record of the opinion of the doctor regarding voluntary admission for the patient as opposed to involuntary admission, the trial court had stated, without objection by respondent's counsel, that at the conference before the hearing the doctor had indicated that involuntary commitment was proper.

In the case at bar, in addition to the respondent's recent history of frequent hospitalizations for mental illness, there is direct evidence on the record of the doctor's opinion that the respondent should not be admitted voluntarily because of his history of having been admitted apparently several times voluntarily, only to request release relatively shortly thereafter when he was not yet well enough to be discharged. The doctor was well acquainted with respondent's condition and behavior and with the poverty of his judgment.

Respondent stresses, and properly so, the requirement in

*Byrd* that the evidence show why voluntary admission is inadequate and why involuntary admission is necessary, which requirement has been met in the instant case. Respondent does not, however, refer to the paragraph of *Byrd* immediately following the statement of that requirement:

"We think that before a trial court would deny a voluntary commitment petition and order involuntary commitment, the trial court should hear evidence as to the advisability of voluntary admission. Generally, testimony from a physician is heard as to the advisability of voluntary admission. 'The physician will normally recommend that the patient be allowed to admit himself on a "voluntary" basis if the person recognizes that he has a problem and wishes to remain in the hospital for treatment. *If the physician feels that the person will immediately sign a request to leave* or if the person has a history of frequent unauthorized absences, *he will probably not recommend that the person be admitted on a "voluntary" basis.'* (Beis, *Civil Commitment: Rights of the Mentally Disabled, Recent Developments and Trends*, 23 DePaul L. Rev. 42, 59 (1973).)" (Emphasis added.) (68 Ill. App. 3d 849, 854, 386 N.E.2d 385, 388-89.)

The record, however abbreviated, shows that Dr. Ferro believed respondent would sign a request to leave shortly after being admitted voluntarily, as he had repeatedly done, and for that reason would not recommend voluntary admission, which might ultimately work him harm. Her recommendation is in accord with accepted medical practice as described in the quotation in *Byrd*.

Respondent contends that the doctrine of least drastic means applies to matters of civil commitment and requires that he be admitted voluntarily rather than involuntarily because, in respondent's view, the legitimate State purpose of protecting the individual from himself can be met as well by the less drastic means of voluntary commitment. However, respondent overlooks the apparently credible testimony of Dr. Ferro and Ms. Gibbons to the contrary. In view of this evidence we need not consider the contention further.

Respondent argues that the State lacked the compelling State interest required to impinge on his fundamental right of liberty. The crux of his argument is that the State may not cause a citizen to be admitted involuntarily "under the guise of *parens partriae*" absent the incapacity to make a "proper decision" with respect to his need for treatment. Respondent concludes that because he recognized his need for psychiatric treatment and, in fact, sought such treatment, he had the capacity to make such a decision. However, the testimony of

both Dr. Ferro and Ms. Gibbons, which the trial court had to have believed in order to have ruled as he did, indicates that respondent can assess correctly his need for psychiatric treatment only at times; at other times he perceives incorrectly and to his detriment that he is well. Indeed, his poverty of judgment in this regard is a manifestation of his illness. In view of this evidence we need consider the contention no further.

Respondent maintains that Dr. Ferro and Ms. Gibbons sought involuntary rather than voluntary admission of him for reasons of "administrative convenience." During cross-examination Dr. Ferro was asked whether it was "true that if the Court sees fit to allow Mr. Rusick to sign a voluntary admittance, if he gives you five days notice, you could, of course—can executive a Petition and have him kept here," to which she replied, "yes, that is true, but there is not—you don't find people so willing to sign petitions sometimes." Later Ms. Gibbons testified to reasons for reluctance on the part of staff to sign such petitions, none of which lend credence to the explanation respondent advances.

Affirmed.

HARRISON, P.J., and KARNS, J., concur.