NO. 4-06-0599    Filed 4/13/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re:  MICHELLE L., a Person Found | ) | Appeal from |
| Subject to Involuntary Admission, | ) | Circuit Court of |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 06MH422 |
| v. | ) | |
| MICHELLE L., | ) | Honorable |
| Respondent-Appellant. | ) | George H. Ray, |
| | ) | Judge Presiding. |

JUSTICE APPLETON delivered the opinion of the court:

The trial court ordered the involuntary admission of respondent, Michelle L., to a mental-health facility.  She appeals on two grounds:  (1) the court should have allowed her to be a voluntary patient; and (2) the State failed to prove, by clear and convincing evidence, that she was a "person subject to involuntary admission" (405 ILCS 5/1-119 (West 2004)).  We disagree with both contentions and affirm the judgment.

I. BACKGROUND

According to the petition for involuntary admission, respondent needed immediate hospitalization for two reasons.  First, she had a mental illness because of which she was "reasonably expected" to inflict serious physical harm upon herself or someone else.  See 405 ILCS 5/1-119(1) (West 2004).  Second, this illness incapacitated her from providing for her own basic physical needs and guarding herself from serious harm.  See 405

ILCS 5/1-119(2) (West 2004).

In the hearing on the petition, respondent's attorney told the trial court:

"MR. CONROY: *** Your Honor, last week we had this hearing, and [respondent] expressed [a] desire to sign a voluntary application form, and the case was continued until today in the hope[] that that would occur. She would still like to sign a voluntary admission form, but[,] apparently, there is an objection from the State[.] [U]nder [s]ection 3-801 [of the Mental Health and Developmental Disabilities Code (Code) (420 ILCS 5/3-801 (West 2004))], [r]espondent may request admission as an informal or voluntary recipient, and she is doing that at this time.

THE COURT: Response, Miss Carey?

MRS. CAREY-RYAN [(assistant State's Attorney)]: The State would object. Her treating physicians at this time do not feel that she could sign a voluntary admission.

MR. CONROY: Why could that be?

MRS. CAREY-RYAN: They feel that she

- 2 -

would sign it and then ask to be released, which would be her right.

MR. CONROY:  Well, it would not be her right to be released, and think the facility here knows what the procedure--

THE COURT:  What is the section that you mentioned, Mr. Conroy?

MR. CONROY:  [Section] 3-801.

THE RESPONDENT:  May I speak?

THE COURT:  The facility director will not approve of her being a voluntary patient?

MR. CONROY:  Well, apparently, I guess that's the position.  I'm not sure.  But the reasoning, as I understand it, is that she might sign a five-day notice in the future, and, of course, this is--I mean, it's just--to the degree that that's a valid ob-jection, it just doesn't seem to ever happen. We just never see any five-day notice cases. At any rate, even if it did happen, that would be her right, and when Miss Carey states that it would be her right to *** leave the facility, that, of course, is not true.  She would not have to be allowed to

- 3 -

leave the facility, and if the facility felt that a petition for involuntary admission was factually supportable, then they would go ahead and file that.

THE RESPONDENT: I need time to find another doctor. The one I have right now--

THE COURT: Find another doctor where?

THE RESPONDENT: Here. He is giving me medication that[,] I find[,] is giving me troubled and jumbled thoughts, and I would not--I had a doctor, but I would not jump to conclusions and do as you expect.

THE COURT: Dr. Myers, you are the agent of the facility director, I take it, today, so--

DR. MYERS: Yes.

THE COURT: And the facility director will not approve her being a voluntary patient?

DR. MYERS: Well, I think that she's indicating here that she really isn't satisfied with the treatment she's receiving, and that indicates to me that, you know, that if she doesn't get exactly what she wants, she

would sign a five-day notice and we'd be doing this again, so I think that--I mean, we'd be doing the court proceedings again very shortly, so I think that we need to proceed with the hearing.

THE COURT:  You may proceed, [Prosecutor]."

The State called the clinical psychologist whom the trial court addressed earlier, James E. Myers.  He testified he had examined respondent and reviewed her medical records and, in his opinion, she was suffering from a bipolar disorder.  He further opined that because of this illness, she was "reasonably expected to inflict serious physical harm on herself."

Carey-Ryan asked him:

"Q. What is the factual basis for this opinion [that respondent was reasonably expected to harm herself]?

A. [S]ince [respondent] has been hospitalized, she's exhibited multiple examples of self-injurious behavior, including throwing *** herself into a sink in the wall, and as recently as two days ago, *** she was banging her head on the floor, and these examples of self-injurious behavior have occurred on

- 5 -

other occasions as well, but[,] also, she's

exhibiting other symptoms of mental illness

on the treatment unit."

Myers had drafted a treatment plan, admitted into evidence as People's exhibit A.  He recommended an initial period of commitment of 90 days, which, in his view, was the least-restrictive alternative.

Respondent then took the stand in her own behalf.  She testified that the medicine she was presently taking was "very different from [her] previous doctor's selection":  it made her groggy and unable to order her thoughts.  These side effects put her "under tremendous duress" and made her frightened and angry. She "need[ed] to be back on the medications [she] was taking before" so that she could pursue her dream of "start[ing] a small business in textiles."  She denied having any present inclination to harm herself; she "loved [herself]."  Because the new medicine had turned her mind into a blur, she could not remember jumping into a sink in the wall.  If she did so, she was only "trying to get free" of the medicine and her environment:  "[i]t was experimental because [she was] so bored and pent up [t]here.  It was brought on by stress and boredom and feeling confined."

Conroy asked respondent:

"Q. If you were allowed to leave today,

where would you go?

- 6 -

A. I would work with my caseworker and
the mental health facility in
Champaign-Urbana [with which] I've worked ***
for many, many years and get back going to
classes, get back with my psychiatrist, Dr.
Sue, and the pills I was taking and get my
mind cleared."

The trial court found, by clear and convincing evidence, that respondent suffered from a mental illness that could cause her to harm herself and that hospitalization for up to 90 days was the least-restrictive alternative.

This appeal followed.

## II. ANALYSIS

### A. The Request for Voluntary Admission

Respondent claims it was error to proceed with the hearing on the petition for involuntary admission after she offered to sign a voluntary-admission form.  Section 3-801 of the Code provides as follows:

"A respondent may request admission as
an informal or voluntary recipient at any
time prior to an adjudication that he is
subject to involuntary admission.  The facility director shall approve such a request
unless the facility director determines that

the respondent lacks the capacity to consent to informal or voluntary admission or that informal or voluntary admission is clinically inappropriate.  The director shall not find that voluntary admission is clinically inappropriate in the absence of a documented history of the respondent's illness and treatment demonstrating that the respondent is unlikely to continue to receive needed treatment following release from informal or voluntary admission and that an order for alternative treatment or for care and custody is necessary in order to ensure continuity of treatment outside a mental[-]health facility.

If the facility director approves such a request, the court may dismiss the pending proceedings but may require proof that such dismissal is in the best interest of the respondent and of the public."  405 ILCS 5/3-801 (West Supp. 2005).

Respondent does not dispute that the facility director denied her request for voluntary admission.  Nor does she complain, specifically, of a lack of documentation (an oral history as opposed to a "documented history").  Instead, she complains of a lack of

evidence to support the denial. According to her, the facility director had no evidence that she lacked the capacity to consent to voluntary admission or that voluntary admission was "clinically inappropriate."

Speaking for the facility director, Myers deemed voluntary admission to be "clinically inappropriate" for respondent (although he did not use that terminology). Because respondent was dissatisfied with the treatment she was receiving at the facility, he foresaw that if her request to be a voluntary patient were allowed, she would forthwith submit a request for discharge, necessitating the filing of another petition for involuntary admission within five days thereafter. See 405 ILCS 5/3-403 (West 2004). Thus, respondent was "unlikely to continue to receive [the] needed treatment following release from informal or voluntary admission and *** an order *** for care and custody [was] necessary to ensure continuity of treatment." 405 ILCS 5/3-801 (West Supp. 2005). The hearing tended to show that Myers was correct, for when respondent took the stand, all she could speak of was "get[ting] free" of her medication and environment.

We recognize the policy of encouraging voluntary admissions. In re Byrd, 68 Ill. App. 3d 849, 854, 386 N.E.2d 385, 388 (1979). This policy "is based on psychiatric evidence indicating that a patient who recognizes his [or her] condition and voluntarily undertakes treatment can more likely be rehabili-

tated than one upon whom therapy is forced." In re Bennett, 251 Ill. App. 3d 887, 889, 623 N.E.2d 942, 944 (1993). Because respondent, by her own admission, wished to quit taking her medication and leave the facility immediately, this rationale was inapplicable to her, and she was not a viable candidate for voluntary admission. See In re Hall, 92 Ill. App. 3d 1136, 1137-38, 416 N.E.2d 731, 732 (1981). Signing a five-day notice appeared to be more than a theoretical possibility in her case. Cf. Byrd, 68 Ill. App. 3d at 855, 386 N.E.2d at 389 ("even if Byrd as a voluntary admittee could seek his release by filing a five-day notice, we believe that fact alone should not prevent him from exercising his right *** to seek a voluntary admission").

### B. Evidence That Respondent Was a "Person Subject to Involuntary Admission"

To order respondent's involuntary admission to a mental-health facility, the trial court had to find, by clear and convincing evidence, that she was a "[p]erson subject to involuntary admission" as defined in section 1-119 of the Code (405 ILCS 5/1-119, 3-700, 3-808 (West 2004)) and that involuntary admission was "the least[-]restrictive alternative" (405 ILCS 5/3-811 (West 2004)). We review the court's factual findings with deference, asking whether they are against the manifest weight of the evidence. In re Nancy A., 344 Ill. App. 3d 540, 554, 801 N.E.2d 565, 579 (2003), appeal denied, 207 Ill. 2d 604, 807 N.E.2d 975

- 10 -

(2004). A finding is against the manifest weight of the evidence only if the opposite conclusion is apparent or the finding is unreasonable, arbitrary, or not based on evidence. Nancy A., 344 Ill. App. 3d at 554, 801 N.E.2d at 579.

Section 1-119(1) of the Code defines a "[p]erson subject to involuntary admission" to include "[a] person with mental illness and who because of *** her illness is reasonably expected to inflict serious physical harm upon *** herself *** in the near future." 405 ILCS 5/1-119(1) (West 2004). Respondent argues that "absent direct evidence of dangerous or threatening occurrences from any witnesses, Dr. Myers failed to clearly and convincingly establish that the respondent was reasonably expected to soon threaten or inflict serious physical harm upon herself due to her mental illness." We find such evidence in the record. "In determining whether a person meets the criteria specified in [section 1-119(1)], the court may consider evidence of the person's repeated past pattern of specific behavior and actions related to the person's illness." 405 ILCS 5/1-119 (West 2004). Myers testified that respondent threw herself into a sink and beat her head on the floor. Respondent thereby repeatedly put herself in serious physical danger. According to respondent, she did these things only because of her medication and involuntary commitment, but the trial court did not have to believe her; it could have concluded that she did these things because she was

- 11 -

suffering from bipolar disorder.

In the hearing, respondent left no doubt what she would do if she were an outpatient: stop taking the medication that Myers had prescribed to treat her mental illness. See In re Emmett J., 333 Ill. App. 3d 69, 73, 775 N.E.2d 193, 196 (2002) ("[The] respondent had refused to take his medications while in the group home. Therefore, a group home would not be a viable alternative to ensure [the] respondent's symptoms were stabilized on his medication"). The record does not reveal who, outside the facility, would persuade respondent to take her medication or prevent her from engaging in self-destructive behavior. Cf. In re Luttrell, 261 Ill. App. 3d 221, 226, 633 N.E.2d 74, 78 (1994) ("The evidence established placement with a relative was a viable option, and Luttrell's uncontroverted testimony was that his brother had agreed to allow Luttrell to reside with him"), with Emmett J., 333 Ill. App. 3d at 73, 775 N.E.2d at 196 ("there was no indication that [the] respondent had someone willing to assist him in his care"). The trial court could have reasonably found that involuntary admission for up to 90 days was the least-restrictive alternative.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

- 12 -

STEIGMANN, P.J., and KNECHT, J., concur.