# ILLINOIS OFFICIAL REPORTS

*In re Lance H.*, 2012 IL App (5th) 110244

| | |
|---|---|
| Appellate Court Caption | *In re* LANCE H., a Person Found Subject to Involuntary Commitment (The People of the State of Illinois, Petitioner-Appellee, v. Lance H., Respondent-Appellant). |
| District & No. | Fifth District<br>Docket No. 5-11-0244 |
| Filed | August 8, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The order entered for respondent's continued involuntary commitment for mental treatment following a hearing at which respondent testified that he wanted to be a voluntary patient was reversed, since the trial court did not comply with the requirement of section 3-801 of the Mental Health Code that respondent's request for voluntary admission be addressed before ruling on involuntary commitment. |
| Decision Under Review | Appeal from the Circuit Court of Randolph County, No. 11-MH-53; the Hon. Richard A. Brown, Judge, presiding. |
| Judgment | Reversed. |

Counsel on
Appeal

Barbara A. Goeben and Veronique Baker, both of Guardianship and Advocacy Commission, of Alton, for appellant.

Randall Rodewald, State's Attorney, of Chester (Patrick Delfino, Stephen E. Norris, Sharon Shanahan, and Neha Sharma, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE STEWART delivered the judgment of the court, with opinion.

Justices Spomer and Wexstten concurred in the judgment and opinion.

## OPINION

¶ 1    On April 28, 2011, the State filed a petition alleging that the respondent, Lance H., a patient at Chester Mental Health Center (Chester), continued to be subject to involuntary admission to a mental health facility pursuant to section 3-813 of the Mental Health and Developmental Disabilities Code (the Mental Health Code) (405 ILCS 5/3-813 (West 2010)). On May 4, 2011, the circuit court conducted an evidentiary hearing on the State's petition. During that hearing, the respondent testified that he wanted to become a voluntary patient. Without acknowledging the respondent's request to become a voluntary patient, the court granted the State's petition for continued involuntary commitment. The respondent appeals from the court's May 4, 2011, order. We reverse.

¶ 2                              BACKGROUND

¶ 3    In the current petition, the State sought an order for the respondent's continued involuntary commitment. Information in that petition as well as in previous opinions of this court[1] indicates that, in 1979, the respondent was incarcerated in the Illinois Department of Corrections. The respondent was incarcerated almost continuously between 1979 and his mandatory parole date of March 27, 1997. Since 1997, he has been admitted numerous times to various mental health facilities, including Chester, as well as incarcerated for criminal offenses and parole violations. In this petition, the State alleged that the respondent was "a person with a mental illness" and asserted two grounds for continued involuntary commitment: (1) he was reasonably expected, unless treated on an inpatient basis, to engage in conduct placing himself or another in physical harm or in reasonable expectation of

---

[1]See *In re Donrell S.*, 395 Ill. App. 3d 599, 919 N.E.2d 512 (2009) (the respondent in the instant case was one of three involuntarily committed respondents in a consolidated appeal); *In re Lance H.*, 402 Ill. App. 3d 382, 931 N.E.2d 734 (2010).

physical harm; and (2) he was unable to provide for his basic physical needs so as to guard himself from serious harm without the assistance of family or others, unless treated on an inpatient basis.

¶ 4    The State based its request for continued involuntary commitment on a statement from the petitioner, David Dunker, whose address is listed as a post office box in Chester, Illinois, but who is otherwise not identified in the record. Mr. Dunker stated that he based his assertion of the need for continued involuntary commitment on the following:

"Mr. Lance H[.] was admitted to Chester on 2-29-08 as an Involuntary admission from Dixon Correctional Center as he was found subject to Involuntary admission upon reaching his projected parole date. He is chronically mentally ill and remains paranoid and aggressive although he does follow his medication regimen. He lacks insight into his mental illness and remains very argumentative. Outside a controlled environment he would quickly decompensate thus becoming a danger to self or others."

The petition also set forth the name of Kim Arrington of Elgin, Illinois, as a "spouse, parent, guardian, or substitute decision maker."

¶ 5    Attached to the petition is an "Inpatient Certificate," signed by T. Casey, M.D., a staff psychiatrist, and dated April 19, 2011. Dr. Casey certified that the respondent was subject to involuntary admission and in need of immediate hospitalization. Also attached to the petition is an inpatient certificate signed by Dr. Kathryn Holt, "LCPC Psychologist 3," stating that she personally examined the respondent and found him subject to involuntary inpatient admission and in need of immediate hospitalization. The State's petition also included copies of the respondent's 30-day treatment plan, dated March 15, 2011. Of note in the treatment plan is the statement that the respondent maintained family contact on a regular basis. The name of the family member is not listed. None of these attachments were referenced in testimony or admitted into evidence during the hearing.

¶ 6    At the evidentiary hearing, the State called Travis Nottmeier, a licensed clinical social worker employed by Chester. Mr. Nottmeier testified that he interviewed the respondent the day before the hearing, that he spoke with members of his treatment team, and that he "reviewed parts of his clinical file." He noted the respondent's diagnosis, that he had a history of suffering from a mental illness, and that, between 1997 and 2010, the respondent had 15 psychiatric hospitalizations, 7 of which had been at Chester. Mr. Nottmeier testified that the respondent displayed "delusional thought content which is grandiose, paranoid, and persecutory," that he periodically exhibited "inappropriate sexual conduct," that he was verbally and physically aggressive, that he was noncompliant with his medication, and that he displayed "poor insight into his mental illness."

¶ 7    Mr. Nottmeier noted that, on March 6, 2011, a peer threw a trash can at the respondent, and then the respondent struck the peer but did not have to be restrained or secluded because "he calmed." On March 17, 2011, the respondent was placed in seclusion after "antagonizing other peers to fight," and on April 22, 2011, he required seclusion again after being loud and demanding over "some minor commissary issues." Mr. Nottmeier stated that the respondent was under a "crush and observe" order to ensure that he took the medications prescribed to him. Mr. Nottmeier testified that, without a structured setting like Chester, the respondent's

condition would further deteriorate so that he would be more likely to hurt himself or others; that because of his mental illness, he could not take care of his own basic physical needs; and that, based on how he had acted out in the month preceding the hearing, Chester was the least restrictive facility.

¶ 8     On cross-examination, Mr. Nottmeier testified that "it was noted" that on January 26, 2011, the respondent displayed delusional thought content by punching a bag in the gymnasium and thinking that "there was a song playing on the radio that the staff specifically put on to mess with him." He said that the respondent participated in therapy but that he sometimes threatened his therapist. Mr. Nottmeier testified that, on February 25, 2011, the respondent "became quite hostile and verbally aggressive during his therapy meeting." Mr. Nottmeier stated that, on April 27, 2011, "it was documented that he was uncooperative and was displaying threatening behavior." He acknowledged that the respondent had limited contact with some of his family members and that the respondent believed he could live with his brother if he were released from Chester. Mr. Nottmeier testified that he was not aware that the respondent had ever expressed a desire to become a voluntary patient, but he knew of no reason why the respondent could not elect to become a voluntary patient.

¶ 9     The respondent testified on his own behalf. His attorney asked him why he did not "feel the need to be within the department," and he responded, "Because I spent 21 years in the penitentiary for a crime that I committed." The respondent testified that, when he got out of the penitentiary, he watched his mother die. He said that from that day forward, he realized that he could not hurt anyone because he knew what it felt like to see someone he loved be hurt. He testified that he would take his medication if he were released because he had "absolutely no personality" and the medicine would keep him alive. He stated that, if he were released, he would be able to take care of his own basic physical needs and that he would live with his brother or his sister in Elgin.

¶ 10     At the end of the respondent's testimony, his attorney asked him about his desire to become a voluntary patient. The following colloquy ensued:

"Q. [Respondent's attorney:] Okay. And whenever we met this morning, you indicated that you would like to become a voluntary patient; is that correct?

A. Yes, sir.

Q. Okay. Do you understand that you need to express that desire to your social worker?

A. I have, and he keeps telling me the same–for the last two years, he's told me, Lance, you got to do five to six months, then you can request voluntary admission, and then we'll have you sign the papers, and he never did that.

Q. Okay. And pursuant to our conversation this morning, you are requesting to become a voluntary patient; is that correct?

A. Yes, sir."

The respondent presented no other evidence. The State did not present any rebuttal.

¶ 11     Immediately after the close of the evidence, the trial court made the following findings:

"The Court finds that Lance H[.] is a person subject to involuntary admission. He's

-4-

been diagnosed as suffering from a schizoaffective disorder, bipolar type. He's been diagnosed as suffering from pedophilia.[2] Because of this illness, he's reasonably expected to engage in dangerous conduct which may include threatening behavior, conduct that may cause other persons to be in expectation of being harmed, unable to provide for basic physical needs, [and] unable to understand his need for treatment. The Court finds hospitalization in the Department of Human Services is the least restrictive environment currently appropriate and available. The Court's considered 15 prior admissions since 1997, delusional thoughts, inappropriate sexual conduct. That's all."

¶ 12      On the same date, May 4, 2011, the trial court entered an order for involuntary treatment. The order is on a preprinted form in which the court placed check marks indicating that the respondent was subject to involuntary commitment in that he was (1) a person with a mental illness who, because of his illness, was reasonably expected to engage in dangerous conduct which could include threatening behavior or conduct that placed him or others in reasonable expectation of being harmed; (2) a person with a mental illness who, because of his illness, was unable to provide for his basic physical needs so as to guard himself from serious harm without the assistance of family or outside help; or (3) a person with a mental illness who, because of his illness, was unable to understand his need for treatment and who, if not treated, was reasonably expected to suffer or continue to suffer mental deterioration or emotional deterioration, or both, to the point that he was reasonably expected to engage in dangerous conduct. The court ordered the respondent to remain hospitalized at Chester. The order does not include any findings or a ruling on the respondent's request for voluntary admission. The respondent filed a timely notice of appeal.

¶ 13                                          ANALYSIS

¶ 14      The respondent argues that both the State and the trial court failed to fully comply with the Mental Health Code by not addressing his request for voluntary admission. The primary statute governing this issue is section 3-801, which provides as follows:

"A respondent may request admission as an informal or voluntary recipient at any time prior to an adjudication that he is subject to involuntary admission on an inpatient or outpatient basis. The facility director shall approve such a request unless the facility director determines that the respondent lacks the capacity to consent to informal or voluntary admission or that informal or voluntary admission is clinically inappropriate. The director shall not find that voluntary admission is clinically inappropriate in the absence of a documented history of the respondent's illness and treatment demonstrating that the respondent is unlikely to continue to receive needed treatment following release from informal or voluntary admission and that an order for involuntary admission on an outpatient basis is necessary in order to ensure continuity of treatment outside a mental health facility.

If the facility director approves such a request, the petitioner shall be notified of the

_____

[2]We note that there is no diagnosis of pedophilia in the record. There is, however, a diagnosis for paraphilia NOS.

request and of his or her right to object thereto, if the petitioner has requested such notification on that individual recipient. The court may dismiss the pending proceedings, but shall consider any objection made by either the petitioner or the State's Attorney and may require proof that such dismissal is in the best interest of the respondent and of the public." 405 ILCS 5/3-801 (West 2010).

¶ 15　　The respondent does not dispute the facts of this case but argues that those facts are insufficient to satisfy the requirements of the Mental Health Code. Where the facts are not disputed but a respondent contends that the court failed to follow the requirements of the Mental Health Code, our review is *de novo*. *In re Alaka W.*, 379 Ill. App. 3d 251, 259, 884 N.E.2d 241, 247 (2008) (where the only issues concern the application of the Mental Health Code to the undisputed facts, the appropriate standard of review is *de novo*). Therefore, the issue we consider is whether the trial court adequately followed the procedures set out in section 3-801 and other provisions of the Mental Health Code, a question of statutory interpretation, for which our review is *de novo*. *In re James S.*, 388 Ill. App. 3d 1102, 1106, 904 N.E.2d 1072, 1076 (2009).

> "When construing a statute, our goal is to determine and effectuate the legislature's intent, best indicated by giving the statutory language its plain and ordinary meaning. [Citation.] We must consider the entire statute in light of the subject it addresses, presuming the legislature did not intend absurd, unjust, or inconvenient results. [Citation.] Reviewing courts will not depart from the statute's plain language by reading into it conditions, exceptions, or limitations that contravene legislative intent." *In re Andrew B.*, 237 Ill. 2d 340, 348, 930 N.E.2d 934, 939 (2010).

¶ 16　　Before we consider the merits of the issue on appeal, however, we must first address the issue of mootness. The order from which the respondent appeals was entered on May 4, 2011. That order, effective for 180 days, expired on November 1, 2011, and is no longer in effect. Therefore, there is no dispute that the underlying case is moot because, whether valid or not, the court's order can no longer serve as the basis for adverse action against the respondent. *In re Alfred H.H.*, 233 Ill. 2d 345, 350-51, 910 N.E.2d 74, 77-78 (2009); *In re Barbara H.*, 183 Ill. 2d 482, 490, 702 N.E.2d 555, 559 (1998). Generally, Illinois courts do not decide moot questions, render advisory opinions, or consider issues arising from orders that can no longer be affected. *In re Alfred H.H.*, 233 Ill. 2d at 351, 910 N.E.2d at 78. When presented with a moot appeal, we are to consider whether the case falls within one of the established exceptions to the mootness doctrine. *Id.* at 355, 910 N.E.2d at 80. Those exceptions are the public-interest exception, the capable-of-repetition-yet-avoiding-review exception, and the collateral-consequences exception. *Id.* at 355-62, 910 N.E.2d at 80-84.

¶ 17　　Under the public-interest exception, courts are allowed to consider an otherwise moot case when "(1) the question presented is of a public nature; (2) there is a need for an authoritative determination for the future guidance of public officers; and (3) there is a likelihood of future recurrence of the question." *Id.* at 355, 910 N.E.2d at 80. This exception is narrowly construed and requires a clear showing of each criterion. *Id.* at 355-56, 910 N.E.2d at 80. Applying the facts of our case to the first criterion, we find that the question presented is of a public nature because it involves the procedures that must be followed when one who is the subject of a petition for involuntary commitment requests voluntary

admission. This court and the Illinois Supreme Court have both previously determined that the procedures to be followed under the Mental Health Code regarding involuntary commitment and treatment are matters of substantial public concern. *In re Lance H.*, 402 Ill. App. 3d at 385, 931 N.E.2d at 738; *In re Mary Ann P.*, 202 Ill. 2d 393, 402, 781 N.E.2d 237, 243 (2002).

¶ 18 The second criterion of the public-interest exception is whether there is a need for future guidance of public officers. The facts in this case meet that criterion because a resolution of the statutory requirements will aid the circuit courts, prosecutors, defense attorneys, and mental health facility personnel who are required to administer the Mental Health Code. In fact, the respondent's court-appointed attorney, a staff attorney for the Guardianship and Advocacy Commission, requested such guidance in the oral argument before this court. The case law construing section 3-801 touches on but does not definitively set forth the procedures to be followed in situations where the respondent requests voluntary admission after the hearing on the petition for involuntary commitment has already begun. As a result, it is appropriate for this court to address the issue and provide that guidance within the factual context of this case.

¶ 19 The third criterion, the likelihood of future recurrence of the question, is also met because every person who is the subject of a petition for involuntary commitment has the opportunity to request voluntary admission under section 3-801 "at any time prior to an adjudication that he is subject to involuntary admission." 405 ILCS 5/3-801 (West 2010). Moreover, after the initial period of involuntary commitment, some portion of those who are involuntarily committed will be the subject of recurring petitions for continued involuntary commitment. See 405 ILCS 5/3-813 (West 2010) (the first and second periods of involuntary commitment on an inpatient basis are effective for up to 90 days each, and the third and following are effective for up to 180 days each). We find that the public-interest exception to the mootness doctrine applies and that we need not consider whether the other exceptions apply as well.

¶ 20 Turning to the merits of the case, we consider whether the trial court failed to follow the requirements of section 3-801 of the Mental Health Code by not addressing the respondent's oral request for voluntary admission before it ruled on the State's petition for involuntary commitment. Outside of the alleged failure to address his request for voluntary admission, the respondent does not challenge whether the evidence supports the trial court's finding that he is subject to continued involuntary commitment. As a result, we do not consider the sufficiency of the State's proof on the petition for involuntary commitment. Therefore, the specific issue is whether the trial court's failure to address the respondent's request for voluntary admission, first asserted during the hearing on the petition for involuntary commitment, amounts to reversible error.

¶ 21 We begin with the basic rules that apply to all cases involving the Mental Health Code. "Involuntary commitment affects very important liberty interests, and thus those seeking to keep an individual so confined must strictly comply with procedural safeguards included within the Mental Health *** Code." *In re Phillip E.*, 385 Ill. App. 3d 278, 284, 895 N.E.2d 33, 40 (2008). The purpose of the procedural safeguards is to "ensure that the mental health system does not become an oppressive tool rather than a means to serve the society in which we live." *Id.* Because involuntary commitment procedures implicate substantial liberty

interests, the respondent's interests must be balanced against the dual objectives of involuntary admissions: (1) providing care for those who are unable to care for themselves due to mental illness and (2) protecting society from the dangerously mentally ill. *In re Kevin S.*, 381 Ill. App. 3d 260, 264, 886 N.E.2d 508, 513 (2008).

> "Civil commitment procedures implicate the State's *parens patriae* powers and police powers. The State acts in the role of *parens patriae* with the purpose of protecting the mentally ill individual by depriving him of his liberty, not to punish him, but to treat him. The State also utilizes its police power to protect its citizens against potentially dangerous acts of mentally ill persons." *In re Torski C.*, 395 Ill. App. 3d 1010, 1017-18, 918 N.E.2d 1218, 1225 (2009).

¶ 22    The distinction between voluntary and involuntary inpatients at mental health facilities is important from a treatment standpoint. Voluntary admissions are considered the preferred method of commencing treatment for an individual suffering from a mental illness. *In re Hays*, 102 Ill. 2d 314, 319, 465 N.E.2d 98, 100 (1984). There is an "absence of compulsion" with the voluntarily admitted, and psychiatric evidence indicates that patients who recognize their conditions and voluntarily undertake therapy are more likely to be rehabilitated than those upon whom treatment is forced. *Id.* The legislature has established procedures for both an initial voluntary admission (see 405 ILCS 5/3-400 to 3-405 (West 2010) (procedures for voluntary admissions to and discharge from mental health facilities)) and a change of status when an involuntarily committed patient seeks to become a voluntary patient (405 ILCS 5/3-801 (West 2010)).

¶ 23    We next review the trial court's order in light of the requirements of section 3-801. The statute provides that the respondent may "request admission as an informal or voluntary recipient at any time prior to an adjudication that he is subject to involuntary admission on an inpatient or outpatient basis." 405 ILCS 5/3-801 (West 2010). Although the word "adjudication" is not defined, it is clear from reading this statute within the context of the entire Mental Health Code that it refers to the court's decision on the pending petition for involuntary commitment. Although the respondent did not request voluntary admission until after the State had finished presenting its evidence in support of the petition for involuntary commitment, there is nothing in the statute to prevent such a request. Here, the respondent announced his request "prior to an adjudication" that he was subject to involuntary commitment. Additionally, before the hearing, the respondent evidently told his attorney that he wanted to change his status from involuntary to voluntary, but there is nothing in the record to indicate that the respondent's attorney attempted to address this issue with the court prior to the beginning of the hearing.

¶ 24    Moreover, when the respondent's attorney asked him about his request to become a voluntary patient, the respondent testified that he had tried to tell the social worker at Chester that he wanted to become a voluntary patient. The respondent testified that, for two years, the social worker had been telling him that he had to "do five to six months" before he could request voluntary admission and then the facility would have him sign the papers. The respondent testified that he never got any papers to sign. Neither the respondent's attorney, the State, nor the court inquired about the respondent's previous attempts to change his status to voluntary, so the respondent's testimony on that issue is unrefuted. Given the respondent's

unrefuted testimony, it appears that he attempted to become a voluntary patient for two years before this hearing. Therefore, the evidence shows that the respondent complied with the first hurdle of the statute by requesting voluntary admission before the adjudication that he was subject to involuntary commitment.

¶ 25 In addition to the timing requirement, the statute also provides for approval by the facility director. The provisions related to the facility director's approval use the verb form "shall" and "shall not." "The courts resort to the plain language of a statute as their first source of information about legislative intent, and the use of the term 'shall' is indicative of the legislature's intention that the statutory provision is meant to be mandatory, not directory." *In re James E.*, 363 Ill. App. 3d 286, 290, 843 N.E.2d 387, 391-92 (2006). Generally, when a statute uses mandatory language, the courts are required to strictly comply with all of its requirements. *Id.* at 290, 843 N.E.2d at 392. Case law construing the Mental Health Code has expressed a clear preference for strict compliance with statutes related to involuntary commitment and involuntary administration of psychotropic medication. *In re Alaka W.*, 379 Ill. App. 3d at 275, 884 N.E.2d at 260. Strict compliance is necessary due to the liberty interests at stake, and the procedural safeguards are, therefore, to be construed strictly in favor of the respondent. *Id.* Pertinent to our case is the requirement that the facility director "shall approve" the request for voluntary admission "*unless* the facility director determines that the respondent lacks the capacity to consent to informal or voluntary admission *or* that informal or voluntary admission is clinically inappropriate." (Emphases added.) 405 ILCS 5/3-801 (West 2010). In the case at bar, there is nothing in the record to indicate that the facility director considered whether to approve the respondent's request.

¶ 26 Comparing the requirements of section 3-801 to what happened in the trial court, it is clear that those requirements were not satisfied. The most glaring omissions are the lack of any evidence concerning the facility director's approval or disapproval of the respondent's request and the trial court's failure to address or take any action on the respondent's request. Implicit in the language of the statute is that the trial court will actually consider and rule on the request, which did not occur in this case. Therefore, for those reasons alone, the court's order is subject to reversal. We will point out the remaining errors for future guidance on this issue. We begin that guidance by reviewing the cases that consider similar factual scenarios.

¶ 27 In the case of *In re Byrd*, the trial court denied the respondent's written request for voluntary admission during the hearing on the petition seeking his initial involuntary commitment. *In re Byrd*, 68 Ill. App. 3d 849, 851-52, 386 N.E.2d 385, 386-87 (1979). On review, the appellate court reversed the trial court's unexplained order. *Id.* at 855, 386 N.E.2d at 389. The court recognized that, when a respondent requests voluntary admission before a decision is made on an involuntary commitment petition, the decision to involuntarily commit him must rest on clear and convincing evidence showing the reasons that voluntary treatment is inadequate and that involuntary commitment is necessary instead. *Id.* at 853-54, 386 N.E.2d at 388. The Mental Health Code requires that all involuntary inpatient or outpatient admissions rest on clear and convincing evidence. 405 ILCS 5/3-808 (West 2010) ("No respondent may be found subject to involuntary admission on an inpatient or outpatient basis unless that finding has been established by clear and convincing evidence.").

¶ 28    In *Byrd*, the court ruled that, before denying a voluntary commitment petition and ordering involuntary commitment instead, the trial court should hear evidence from a physician as to the advisability of voluntary admission. *In re Byrd*, 68 Ill. App. 3d at 854, 386 N.E.2d at 389. The appellate court reversed the trial court's order and remanded for a determination of whether the respondent's involuntary commitment was in the public's and the respondent's best interest because there was nothing in the record to show the reason for the denial of the request for voluntary admission. *Id.* at 855, 386 N.E.2d at 389. The facts of the instant case are very similar to those in *Byrd*.

¶ 29    The State argues that *Byrd* is distinguishable because the respondent there filed a written petition requesting voluntary admission. Although the respondent in our case did not file a written request for voluntary admission, there is no requirement in section 3-801 that the request be in writing, so the distinction is irrelevant. Therefore, we reject the State's argument that *Byrd* is distinguishable on that basis.

¶ 30    The decision in *Byrd* makes it clear that, when a respondent requests voluntary admission before a petition for initial involuntary commitment is decided, the court must hear evidence about the advisability of voluntary admission before ruling on the involuntary petition. The court in *Byrd* explained the basis of that requirement:

> "Both the United States Constitution and the Illinois Constitution provide that no person shall be deprived of life, liberty, or property without due process of law. [Citations.] Involuntary commitment of an individual for any reason is a deprivation of that individual's liberty. [Citation.] Before one is committed involuntarily, the reasons for that commitment must be established in an appropriate proceeding. [Citation.] Thus the evidence must show why seeking treatment voluntarily was not adequate and still necessitated an involuntary commitment." *Id.* at 854, 386 N.E.2d at 388.

In the case at bar, there is no evidence to show why voluntary treatment would be inadequate, how involuntary commitment would be more suitable for the respondent, or how involuntary commitment would better protect the public. In fact, the State's sole witness testified that he knew of no reason why the respondent could not elect to become a voluntary patient.

¶ 31    In 1983, this court affirmed the denial of a request for voluntary admission after the respondent testified that he wanted to be a voluntary patient during the hearing on the petition for involuntary commitment. *In re Rusick*, 115 Ill. App. 3d 108, 110-11, 450 N.E.2d 418, 420-21 (1983). The court determined that there was sufficient evidence supporting the denial of voluntary admission on the basis of the respondent's "recent history of frequent hospitalizations for mental illness" and the testimony of a psychiatrist who was "well acquainted with respondent's condition and behavior and with the poverty of his judgment." *Id.* at 112, 450 N.E.2d at 422. The psychiatrist testified that the respondent should not be admitted voluntarily due to his history of repeatedly leaving the facility shortly after being admitted voluntarily "when he was not yet well enough to be discharged." *Id.* at 112, 450 N.E.2d at 422. In affirming the trial court's order, the appellate court also relied on the testimony of a hospital employee that the respondent could not reliably assess his need for psychiatric treatment and that, at times, he perceived that he was well when he was not, which was a "manifestation of his illness." *Id.* at 114, 450 N.E.2d at 422.

¶ 32   In the instant case, there is no similar testimony. The State's only witness, Mr. Nottmeier, testified that the respondent had been involved in altercations with peers and had been placed in segregation twice in the month before the hearing. Evidence that the respondent did not always comply with Chester's rules and sometimes required disciplinary intervention is not evidence that the respondent had a known history of not responding to voluntary treatment or of requesting to leave the facility when not well enough to do so.

¶ 33   In 2007, the Fourth District Appellate Court considered an appeal in which the respondent argued that the trial court should have allowed her request to become a voluntary patient and that the State failed to prove by clear and convincing evidence that she qualified for involuntary commitment. *In re Michelle L.*, 372 Ill. App. 3d 654, 655, 867 N.E.2d 1187, 1188 (2007). In that case, the court noted that the respondent did not dispute that the facility director had denied her request to become a voluntary patient. *Id.* at 658, 867 N.E.2d at 1190. The court affirmed the denial of voluntary admission, in part, because "respondent, by her own admission, wished to quit taking her medication and leave the facility immediately." *Id.* at 659, 867 N.E.2d at 1191. In addition to finding the denial of the voluntary admission appropriate, the court found clear and convincing evidence that the respondent had "repeatedly put herself in serious physical danger" when not subject to involuntary commitment. *Id.* at 660, 867 N.E.2d at 1191. There is no similar evidence in the current appeal.

¶ 34   Applying the rulings in these cases to the facts of our case, we find that the trial court should have, at a minimum, considered whether any of the evidence already presented proved that the respondent "still necessitated an involuntary commitment." *In re Byrd*, 68 Ill. App. 3d at 854, 386 N.E.2d at 388. Since the trial court did not comment on whether voluntary commitment would be sufficient, did not have any information on whether the facility director would approve the request, and did not make any findings about whether the request would be in the best interest of the respondent and the public, the order fails to comply with the statute or the applicable case law.

¶ 35   It is important to note for future cases that the statute requires the facility director to consider and approve the respondent's request for voluntary admission *unless* the director finds that (1) the respondent lacks the capacity to consent to voluntary admission *or* (2) voluntary admission is clinically inappropriate. The facility director may not determine that voluntary admission is clinically inappropriate without a "documented history of the respondent's illness and treatment demonstrating that the respondent is unlikely to continue to receive needed treatment following release" from voluntary admission and that an order for involuntary admission is necessary. 405 ILCS 5/3-801 (West 2010). In the case at bar, there was no evidence that the facility director was even aware of the respondent's request, so there is no evidence to show whether or not the facility director believed that the respondent had the capacity to consent or if the request was clinically inappropriate. In any future hearings, the court should expect to hear such evidence, and if the parties are not prepared to present such evidence, the court should continue the proceedings pursuant to section 3-800(b) of the Mental Health Code. 405 ILCS 5/3-800(b) (West 2010) ("If the court grants a continuance on its own motion or upon the motion of one of the parties, the respondent may continue to be detained pending further order of the court. Such continuance

-11-

shall not extend beyond 15 days except to the extent that continuances are requested by the respondent."). Such a continuance would allow the respondent to apply for voluntary admission and the facility director the opportunity to act upon it.

¶ 36       Above all, the statute requires the court to consider "the best interest of the respondent and of the public." 405 ILCS 5/3-801 (West 2010). That consideration requires the court to employ its discretion to decide if additional proof is required. In exercising that discretion, the following must be clear on the record: (1) that the trial court considered the respondent's request for voluntary admission if that request is made before the court has ruled on the petition for involuntary commitment; (2) that the facility director has considered whether the statutory requirements for voluntary admission have been met; and (3) that the decision to order either voluntary admission or involuntary commitment is in the best interest of the respondent and the public.

¶ 37                              CONCLUSION

¶ 38       The trial court's order of May 4, 2011, is reversed.

¶ 39       Reversed.